249 So.2d 6 (1971)
The STATE of Florida, Appellant,
v.
PUTNAM COUNTY DEVELOPMENT AUTHORITY, Appellee.
No. 40788.
Supreme Court of Florida.
May 27, 1971.
*7 Stephen L. Boyles, Palatka, for appellant.
E.L. Eastmoore, Palatka, for appellee.
*8 DEKLE, Justice.
This is a direct appeal from a final decree of the Circuit Court of the Seventh Judicial Circuit of Florida, in and for Putnam County, validating and confirming the issuance of $4.5 million Industrial Development Revenue Bonds, Series 1971, of the Putnam County Development Authority, to be issued for the purpose of financing the acquisition and construction of a water treatment facility. We have jurisdiction by direct appeal pursuant to Fla. Const. art. V, § 4(2), F.S.A. as a bond validation proceeding.
Under the Florida Air and Water Pollution Control Act, Fla. Stat. § 403. 261 et seq., F.S.A., Ch. 67-436, Laws of Florida, General Laws of 1967, industrial effluent discharged by industrial or manufacturing facilities must meet statutory standards of purity and must comply with the rules and regulations regarding such effluent and its discharge, which rules and regulations have been promulgated by the Florida Air and Water Pollution Control Commission. The Control Commission is statutorily empowered to issue cease and desist orders and to levy fines against industrial and manufacturing facilities which discharge industrial effluent in violation of the aforementioned statutory and administrative standards.
Hudson Pulp and Paper Corp., a corporation organized under the laws of the State of Maine, owns and operates a pulp and paper mill in Putnam County and employs, in connection therewith, an annual average of 2,500 people. By letter dated November 27, 1967, the Control Commission notified Hudson that it was discharging improperly treated industrial waste water from its Palatka mill in violation of law and ordered Hudson to furnish, within 90 days, evidence of corrective procedure. Hudson complied with the order and has agreed with the Control Commission to provide the water treatment facility in issue. The plans for said water treatment facility have been approved by the Control Commission, which has given Hudson until January 31, 1973, to comply.
Failure by Hudson to provide the facility within the time allotted will subject it to the imposition of fines not exceeding $5,000 per day. If such fines are levied, Hudson would be forced to curtail or terminate its operations at the Palatka mill. Such curtailment or termination would cause Hudson to discharge a significant number, if not all, of its employees at the Palatka mill.
Appellee, Putnam County Development Authority, was created and exists as a public body corporate and politic under Ch. 61-2727, Laws of Florida, Special Acts of 1961 as amended. The Development Authority has agreed to finance the acquisition and construction of a water treatment facility necessary to assure the continued operation of the Palatka mill and the employment attendant thereto. Said water treatment facility will consist of approximately 1,300 acres of aeration ponds together with the necessary pumps and piping. When completed, the project will be operated by Hudson.
The Florida Industrial Development Financing Act, Fla. Stat. §§ 159.25-159.43 F.S.A., Ch. 69-104, Laws of Florida, General Laws of 1969, authorizes any county, municipality, state, special district or other local governmental body to acquire and construct a project for the purpose of promoting the industrial economy of the state, to increase opportunity for gainful employment and purchasing power, to improve living conditions and otherwise contribute to the prosperity and welfare of the state and its inhabitants and to finance the acquisition and construction of such projects by the issuance of revenue bonds. The Development Authority, by resolution adopted November 17, 1970, as amended on January 21, 1971, has authorized the issuance of $4.5 million industrial development revenue bonds to be dated as of April 1, 1971, the proceeds of which are to be used to acquire and construct the project. Hudson *9 Pulp and Paper Corp. would be the vendee of said revenue bonds.
The resolution also provides for the execution and delivery of a contract of sale to be dated as of April 1, 1971, between the Development Authority and Hudson. The contract of sale provides that the Authority will acquire the necessary 1,300 acres and construct thereon the water treatment facility and sell the project to Hudson, pursuant to the terms of said contract of sale.
The resolution further provides for the execution and delivery of a mortgage and indenture of trust to be dated as of April 1, 1971, in order further to secure the payment of the bonds. The resolution and the indenture provide that, subject to the terms and provisions of contract of sale and indenture, the Development Authority will collect the purchase price installments and other payments from Hudson for the purchase of the project; that the purchase price installments and other payments so collected by the Development Authority will at all times be sufficient to provide funds for the payment of the principal and redemption premium on the bonds, if any, and of the interest on all bonds issued under the terms of the indenture as the same shall become due and payable. It is further provided that such collections will be sufficient to make all other payments required by the indenture; that such revenue shall be deposited in the manner and held for the purposes specified in the indenture; and that the contract of sale will be pledged under the indenture.
The resolution and indenture provide that the Development Authority is not obligated to pay said bonds or the interest thereon except from the contract payments paid to the Development Authority pursuant to the contract of sale and pledged therefor and the property mortgaged and pledged under the indenture. Neither the faith and credit nor the taxing power of the State of Florida or any political subdivision thereof, including the Development Authority and the County of Putnam, is pledged to the payment of the principle and interest in premium, if any, on said bonds. No holder of said bonds shall ever have the right to compel any exercise of the taxing power on the part of the State of Florida or of any political subdivision thereof possessing the taxing power to pay said bonds or the interest thereon, nor to enforce payment therefor against the property of the State of Florida or of any political subdivision thereof, except as permitted in the industrial act and as provided for in the indenture.
The indenture further provides, in the event of default by Hudson, for the reentering of the project by a Trustee for and on behalf of and in the name of the Development Authority, in the manner described in the contract of sale and indenture, for the purpose of protecting the rights of the Development Authority and the bond holders.
The installment purchase price payments, to be derived from the contract of sale relating to the project, are not pledged or encumbered in any manner, except as provided in the resolution and indenture.
The State of Florida, in answering the appellee's complaint for validation, admitted that under the Constitution and Laws of the State of Florida, local agencies have lawful authority to issue industrial development revenue bonds to finance the acquisition and construction of projects defined in the industrial act. The answer alleged, however, that (1) the water treatment facility did not constitute a "project" as defined in the industrial act, (2) neither the Florida Constitution nor the industrial act permit the Development Authority to mortgage the project as security for the payment of the bonds, (3) the industrial act does not authorize the entering into of the contract of sale between the Development Authority and Hudson and the pledging of the payments to be made pursuant to the contract of sale under the indenture. The Circuit Court denied all of the objections contained in the answer and validated the bonds. This appeal followed.
*10 Appellant argues that the industrial act does not authorize the Development Authority to finance the acquisition and construction of the paper mill treatment facility at the Palatka mill. The industrial act, it is argued, requires that a project have a positive effect on the area economy; and that since the only effect of this project is to maintain the status quo, it fails to meet the requirements of the Act. We do not agree.
The economic contribution of the project is amply demonstrated in the trial judge's final judgment. He found that Hudson is one of the major industries located in Putnam County and provides employment opportunities to a large number of Putnam County inhabitants. The curtailment or termination of operations would cause Hudson to discharge a large number of its employees, in an area where other, ready employment would not likely be available. On the other hand, the acquisition and construction of the treatment facility would increase the attractiveness of Putnam County to new industry and would provide additional, gainful employment at the Palatka mill.
Economic benefit is not the only purpose of the Act. Another factor is to "improve living conditions, and otherwise contribute to the prosperity and welfare of the state and its inhabitants * * *." It is hard to imagine a more propitious project to improve the living conditions in our great state at this time than a pollution control project. This is a rapidly accelerating problem in many of our states. Such a modern adjunct to today's expanding industry would also contribute to the economic growth of this lovely area of Florida on one of the world's most beautiful rivers, the St. Johns, which courses through the rich pinelands which provide the natural resource for the myriad paper products originating in this plant. It is evident that the statute authorizes the issuance of revenue bonds to finance projects of this nature.
Appellant's contention that the word "project" does not include this pollution control facility is without merit. To qualify as a "project", the undertaking does not first have to comprise a complete industrial or manufacturing plant as suggested by appellant. The definition of the word "project" in the Act specifically includes the following: any rehabilitation, improvement, renovation, or enlargement of, or any addition to, any buildings or structures for use as a factory; mill; processing plant; assembly plants; fabricating plants; industrial distribution center; repair, overhaul, or service facility; test facility; and other facilities. The project in question here is clearly an improvement, an enlargement, an addition to, a service facility.
Fla. Stat. § 159.35, F.S.A. provides for "the mortgaging of any project or any part thereof as security for the repayment of the bonds." There could be no clearer statutory authorization for the mortgaging of projects. Language elsewhere in the statute to the effect that bonds may be issued only if they are payable solely from revenue derived from the sale, operation or leasing of the project will not defeat this specific authorization to mortgage. We cannot charge the Legislature with enacting contradictory provisions in the same Act. It is our duty to read the several provisions of the Act as consistent with one another rather than in conflict, if there is any reasonable basis for consistency.
We now come to the most critical point in this validation proceeding. It involves the question of whether the Legislature can constitutionally provide for such a project to be mortgaged as security for repayment of the bonds. We recently held in Nohrr v. Brevard County Educational Facilities Authority, Supreme Court, 247 So.2d 304, filed April 21, 1971, that "With certain exceptions not pertinent to the case sub judice, a mortgage with the accompanying right of foreclosure is not constitutionally permissible without an election."
*11 Fla. Const. art. VII, § 10, reads in part as follows:
"Section 10. Pledging credit.  Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person; but this shall not prohibit laws authorizing: * * * (c) the issuance and sale by any county, municipality, special district or other local governmental body of (1) revenue bonds to finance or refinance the cost of capital projects for airports or port facilities, or (2) revenue bonds to finance or refinance the cost of capital projects for industrial or manufacturing plants to the extent that the interest thereon is exempt from income taxes under the then existing laws of the United States, when, in either case, the revenue bonds are payable solely from revenue derived from the sale, operation or leasing of the projects. If any project so financed, or any part thereof, is occupied or operated by any private corporation, association, partnership or person pursuant to contract or lease with the issuing body, the property interest created by such contract or lease shall be subject to taxation to the same extent as other privately owned property."
Commencing with the case of Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558 (1935), this Court without exception has held that revenue bonds secured by a mortgage on the physical properties to be financed cannot be issued by public bodies unless approved at an election. After Section 6, Article IX, of the 1885 Constitution became effective in 1930, the Court held that any obligation which directly or indirectly committed the future ad valorem taxing power of a political subdivision must be approved at an election. Leon County v. State, 122 Fla. 505, 165 So. 666 (1936). In Hollywood Inc. v. Broward County, 90 So.2d 47 (Fla. 1956), the County endeavored to issue obligations without an election, to purchase real estate subject to an existing mortgage. There was no assumption of the mortgage obligation on the part of the County. However, the Court denied validation of the proposed bond and stated:
"This is so, because when the County acquired the property the mortgage to which it was subject became a charge against the property, and the County was placed in a position of being coerced to meet the annual requirements for interest and maturing principal under the mortgage. The alternative would be to lose the property by foreclosure. The County can be expected to expend substantial sums for development of the property and to equip it for the public purposes for which it was acquired. That added investment would increase the loss to the County if the mortgage should be foreclosed, and it stimulates the coercive effect of the mortgage, compelling its payment by the County.
"A scheme of financing which directly or indirectly obligates a taxing unit such as a county to pay a sum with interest extending over a period of years is in effect an attempt to create a binding, continuing interest-bearing contract obligation to pay money in the future, which violates the intent of the provisions of Section 6 of Article IX of the Constitution * * *."
Subsequent to the line of cases which invalidated bonds involving a mortgage on the project to secure the repayment of the bonds, subsection (c) of section (10), Article VII, was added in the 1968 Constitution. This new provision brought about a great innovation in the bonding field. It authorizes the once prohibited practice of issuing bonds for purely private projects when they meet the requirements prescribed. Our question, then, is whether subsection (c) (2) creates an exception to prior case law invalidating bonds which were secured in part by a mortgage on the project. It will be seen that it does.
*12 In Nohrr v. Brevard County Educational Facilities Authority, supra, this Court stated:
"While perhaps the county would experience no coercion to levy a tax to prevent the foreclosure of the project leased to this nonprofit corporation in the event of a default; yet, such would not be the case if these bonds were issued to finance a project for Brevard Junior College or for the University of Florida. Most certainly the county or the legislature would feel morally compelled to levy taxes or to appropriate funds to prevent the loss of those properties through the process of foreclosure.
"* * * Consistency is desirable and absent specific constitutional authority a mortgage securing revenue bonds of a public body should not be approved without an election."
It is clear from the above-quoted language of Nohrr, that the Legislature may not provide for the mortgaging of projects to secure the repayment of bonds where a public institution could in any way become the lessee of the project. It is in such a contingency that the temptation would arise for the Legislature, or other state agency, to prevent the loss of properties through the process of foreclosure by levying taxes or appropriating funds.
In Nohrr, the "higher education facilities authorities law," Fla. Stat. §§ 243.18-243.40 (1969), F.S.A., permitted the counties to create county educational facilities authorities which would assist institutions of higher education to obtain the necessary financing to develop and expand their educational facilities. There was no distinction made between public institutions of higher learning and private institutions. Since public institutions could, under the Act, be the beneficiary of the bond issue, any provision for mortgaging the project would be unconstitutional. We then held that for the sake of consistency we would not interpret the Act one way for private institutions while interpreting it another way for public institutions.
The present case does not involve the same situation that was present in Nohrr. The "Florida Industrial Development Financing Act" was enacted pursuant to Fla. Const. art. VII, § 10(c) (2). The Act and the constitutional provision involved here are glaring exceptions to the old constitutional provision that no revenue bonds could be used to finance projects where the benefit to private interest was the dominal purpose. State v. Jacksonville Port Authority, 204 So.2d 881 (Fla. 1967). The purpose of the project in Nohrr was admittedly public. Here, by contrast, the purpose is admittedly private  the benefit to the public being an indirect one. Fla. Stat. § 159.30(1), F.S.A. provides that no project financed under the provisions of this Act shall be operated by the local agency (here the Development Authority) or any other governmental agency, with certain exceptions not pertinent here. Therefore, it is apparent from the Act, and from the purpose of the Act, that the direct beneficiary of any project financed under this Act is a private institution or individual. In the event of a threatened foreclosure, then, the only party threatened with a loss would be the private party who was the beneficiary of the project. Therefore it follows that neither the State nor the County would feel compelled, directly or indirectly, to levy taxes or appropriate funds to prevent the foreclosure. The public would stand to lose no more in this foreclosure proceeding than it would in any other foreclosure proceeding which involved a local business or industry.
We hold on this reasoning that the mortgaging provisions contained in Fla. Stat. § 159.35, F.S.A. do not directly or indirectly pledge the credit of the State or its political subdivisions. It should be noted that Fla. Stat. § 159.33, F.S.A. requires that each bond issued under this Act contain on the face thereof a statement to the effect *13 that the local agency shall not be obligated to pay the same nor interest thereon except from the revenues and proceeds pledged therefor, and that neither the faith and credit nor the taxing power of the local agency or of the state or any political subdivision thereof is pledged to the payment of the principal of, or the interest on, such bonds.
Appellant's final point, that the Act does not authorize the sale of the project, is without merit in view of the numerous references in the Act to the sale of the project.
No error having been demonstrated, the final judgment appealed from is hereby
Affirmed.
ERVIN, Acting C.J., and CARLTON, ADKINS, BOYD and McCAIN, JJ., concur.