DEKLE, Justice
(dissenting).
The enabling “project” essential to the validation of the bonds in question is plainly inconsistent with the purpose for the creation of the Jacksonville Port Authority, thereby prohibiting that Authority from acting pursuant to Fla.Stat. Ch. 159, Part II and under Fla.Const. art. VII, § 10(c). Further defect barring approval here is the fact that there is not a direct leasing of the facility to the using agency, namely the National Distributing Company. Instead, the agreement by the Port Authority is with C & D Realty Corp. which will in turn later, it says, lease to National for operation. This is a defective link in the control of the proposed project because under this indirect arrangement the use can be varied without direct contact or control between the Port Authority and the using agency.
*7 The language of the Port’s Charter[1] demonstrates that a liquor and wine processing and distribution plant is not included within the projects which are authorized under that legislation which creates the Jacksonville Port Authority. The majorh ty agrees that the project must be within the meaning of the charter provisions in order to meet the requirements of this constitutional creation of such new revenue bonds. Fla.Const. art., VII, § 10(c); Fla. Stat. Ch. 159, Part II.
It is understandable that the authorized projects contained in the enabling legislation for the Port of Jacksonville to which we must look, do not include wholesale distributing manufacturers in general nor breweries, nor wine distribution plants, inasmuch as Jacksonville like many cities has been benefited by private industry which has invested large sums of money in the economic development of that great “Gateway City”. Recognizing this, those who backed and supported the Port and its Port Authority directed their attention toward the usual and ordinary matters of the development of a great port which this is and toward facilities related to a port such as defined in the Act creating it, and purposely left out provision for competing industry. Some of the Act’s language in § 2 provides:
“(f) The word ‘project’ shall embrace any one or any combinations of two (2) or more of the following, to wit: facilities for the construction, manufacture, repair or maintenance of ships and other facilities, directly or indirectly related to the promotion and development of tm-terhome commerce, and other harbor, port, shipping and airport facilities of all kinds, including, but not limited to, harbors, channels; turning basins, anchorage areas, jetties, breakwaters, water ways, canals, locks, tidal basins, wharves, docks, piers, slips, bulkheads, public landings, runways, taxiways, warehouses, terminals, refrigerating and cold storage plants, railroads and air and motor terminals for passengers and freight, rolling stock, car ferries, boats, airplanes, conveyors and appliances of all kinds for the handling, storage, inspection and transportation of freight and the handling of passenger traffic, mail, express and freight . . . . ” (Ch. 67-1533, Laws of Fla.) (emphasis added.)
It will be seen that this clearly does not include a liquor and wine distribution business. Such a “project” seems as foreign to the creating legislation for the Jacksonville Port Authority as an alcoholic at a Temperance Convention.
The people of this state will be shocked to learn via the majority opinion that their vote for the new 1968 Constitution was a vote in favor of providing low cost bond financing for a national wine and liquor distributor at a public port in Jacksonville, Florida. This is a novel result, marking a new era when public support is provided for a competing business without regard for what type of concern it is, as against local private industry which over the years has in good faith built the community’s economic base.
The allowance of such an improper encroachment by private industry under this constitutional largesse extends to it a financial windfall in providing revenue bonds that may invite attack under the equal protection provision of the U. S. Constitution.
The well established doctrine of ejusdem generis precludes such a project as that sought here. The doctrine provides that “where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase will usually be construed to .refer to things of the same kind or species as those specifically enumerated.” [2] Obviously facilities pro *8 moting waterborne commerce do not include trucked in bulk wine and liquor, as the testimony clearly shows.
Our previous approvals of such bonds under the new constitutional provision are only in clear cases where the purpose is plainly within appropriate areas, e. g., pollution control, educational facilities and meat processing.[3]
The majority hinges its permissiveness for spiritous liquors as a Port Authority “project” upon the promotion of waterborne traffic by import of the wines and liquors through the port by ship. The testimony is to the contrary. This 5-acre, $1 million bottling plant will receive “by rail and tank trucks” its wine output of approximately two million gallons per year, mostly from the State of California except for about 10% or 200,000 gallons from the State of Florida. The company official (only witness on the subject) flatly denied use of a tanker ship:
“Q. Mr. Carlos, with reference to the answers, your answer to Judge Wine-geart’s questions, do you at this time plan to use a tanker to bring in imported wines ?
“A. No, sir.” (p. 116)
It is to be distributed 40% in the Jacksonville trading area and the remaining 60% over the State of Florida by truck and rail lines. This is of course not the “waterborne” traffic suggested.
With regard to the bulk wine, the undisputed testimony of the company’s official was:
“A. . . . We will buy from within the United States, we will bottle it, we will manufacture that. It will come in in tank cars, it will be put into our wine tanks and from that, it will be bottled on machinery and we will end up with a finished product.
“Q. How did you say that would come in?
“A. In tank cars.
“Q. From all—
“A. Tank cars or trucks. In Florida, we bring it in tank trucks. From California, for instance, it would come in in tank cars.” (p. 106)
So we see that despite attempts to develop “possible imports by ship”, the only actual testimony, that of the distributing company’s official, is as above. It dissolves the foundation for the majority decision, i. e., that the “project” would “promote waterborne traffic.” Without such a basis it is admitted that there is no “project” upon which to authorize the bond issue.
The anticipated plant in Jacksonville is to replace the present Miami bottling operation of this company. ' It is interesting that the company officer conceded that the same imported wines distributed from Miami are being received now through the Jacksonville Port. It is difficult to see how continuing the same process (in a lesser amount by 15%, he testified) in Jacksonville will “increase the waterborne” import, which is the majority’s predicate for approval. It is apparent that the predicate simply is not substantiated in the testimony in this record and that there is absolutely no basis for the approval of such a project for revenue bonds.
The vacillating testimony and ultimate admissions of the liquor company official do not support the avowed (and essential) purpose of “the promotion of waterborne commerce.” The admittedly “minor” imports for cargo as bottles in a ship’s hold is the same as NOW being imported for the existing Miami plant (proposed to be moved to Jacksonville) and the imports for Georgia (not to be served in the proposed operation). Thus, there is no net increase “promoted” by this operation. If *9 any can be inferred, it would be infinitesimal, if any at all. Hardly such a “promotion” of the economy as was anticipated as sufficient to activate this new constitutional provision for revenue bonds.
The principal operation testified to by the company officer would be “primarily bottling (bulk) wines” ALL of which would come ONLY by “truck or rail tankers.”
“A. We will operate a manufacturing plant primarily bottling wines and alcoholic beverages. We will distribute, we will have an output approximately two million gallons of wines.
“Q. Per year?
“A. Per year; yes, sir.” (p. 96)
As to the “spiritous liquors” (“Scotch lines”) these are only in bottles and are purchased from distilleries “in Kentucky and some in Tennessee, Ohio.” “Imported” yes, but “imported” from other importers. This adds nothing to “waterborne” commerce at the Port of Jacksonville. The interrogating attorneys used every inferential phrase possible to “make a record” to support such a project but the answers in toto simply do not “make it”.
“Q. You buy them directly from those persons or buy them from people here in this country?
“A. We buy them from people within this country, yes, sir.
“Q. I see. In other words, you don’t import them, you just buy them from somebody who has imported them?
“A. Well, like for instance, your Scotch lines, there is a selling agent or company that we buy through.
“Q. And that same policy will continue, I assume, here from the Jacksonville operation?
“A. Yes, sir.” (emphasis supplied) (p. 104)
Following the testimony quoted in the majority opinion inferring DIRECT imports is the following which negates such inference:
“Q. And you will — you will buy those from- — directly deal directly with the people overseas or will you buy from a selling agent here in this country?
“A. Majority from a selling agent.” (emphasis supplied) (p. 104)
The Court then took up the inquiry but the witness stuck to his “no direct shipments” in the following exchange:
“THE COURT: Well, let me rephrase my question: I would assume you try to buy in such quantities where the ship would be direct to you and not circuitous through the selling agent?
“THE WITNESS: There are brands that have to come through a selling agent, liquor, Scotch.” (p. 105)
And so it was throughout the repeated efforts to show differently. It just isn’t there. They “lean too heavily upon a thin reed.”
The “project” is clearly not one authorized by the Port charter.
I dissent.

. Ch. 63-1447, 67-1533, Laws of Florida.

. Children’s Bootery v. Sutker, 91 Fla. 60, 107 So. 345, 347 (1926) ; Goldsmith v. Orange Belt Securities Co., 115 Fla. 683, 156 So. 3 (1934) ; Arnold v. Shumpert, 217 So.2d 116 (Fla.1968) ; and State ex rel. Soodhalter v. Baker, 248 So.2d 468 (Fla.1971).

. State v. Putnam Co. Develop. Auth., 249 So.2d 6 (Fla.1971) ; Nohrr v. Brevard County Educational Fac. Auth., 247 So.2d 304 (Fla.1971) ; and State v. County of Dade, 260 So.2d 875 (Fla.1971).