281 So.2d 310 (1973)
STATE of Florida, and the Taxpayers, Property Owners and Citizens of Orange County Including Non-Residents Owning Property or Subject to Taxation, et al., Appellants,
v.
ORANGE COUNTY, Florida, a Political Subdivision of the State of Florida, Appellees.
No. 43247.
Supreme Court of Florida.
July 31, 1973.
J. Robert Eagan, State's Atty., for appellants.
Steven R. Bechtel, Mateer & Harbert, Orlando, and Frank L. Watson, Freeman, Richardson, Watson, Slade, McCarthy & Kelly, Jacksonville, for appellees.
Thomas C. Britton and Lawrence R. Metsch, Shutts & Bowen, Miami, for Naples Civic Association, as amicus curiae.
ERVIN, Justice.
This cause is before us on direct appeal from a decision of the Orange County Circuit Court validating "not exceeding $3,000,000 Capital Improvement Bonds," to be issued by Orange County. We have jurisdiction under Florida Constitution Article V, Section 3, and Florida Statute 75.08, F.S.A. Oral argument having been waived by the parties, we proceed to expedite disposition of the cause.
*311 The appellee, Orange County, filed its complaint on October 27, 1972, for validation of the bonds in question. The bonds were to be issued by the County to acquire and construct certain county capital projects pursuant to County Ordinance No. 72-5, enacted September 5, 1972.
On October 27, 1972, an Order to Show Cause why such obligations should not be validated was entered in the Circuit Court for Orange County directing the State of Florida and the several property owners, taxpayers and citizens of Orange County, Florida, including non-residents owning property or subject to taxation therein and all others having or claiming any right, title or interest in property to be affected by the issuance by the County of the obligations, to appear on December 11, 1972, to show cause why the obligations and the proceedings authorizing the same should not be validated and confirmed.
County Ordinance No. 72-5 authorized the County to acquire and construct county capital projects, issue revenue obligations to finance the cost thereof and provided for their payment solely from the proceeds of race track funds and jai alai fronton funds accruing annually to Orange County pursuant to Chapters 550 and 551, Florida Statutes, F.S.A., and allocated to the Board of County Commissioners pursuant to law.
After considering the State's answer, the exhibits introduced into evidence and hearing the testimony and argument of counsel, the Court on December 11, 1972, entered its final judgment validating the bonds.
By this appeal we are called upon to decite whether noncharter counties have the power to issue capital improvement bonds repayable solely from the county's share of race track and jai alai funds.
Sections 1(f) and (i) of Article VIII, State Constitution, together with Section 6(b) (Schedule), Article VIII thereof, continue in counties without charters the same status and delegated powers that existed in them pursuant to law prior to the adoption of the 1968 Constitution, with the additional power to adopt ordinances except where inconsistent with enabling statutes.[*]
There is nothing in the 1968 Constitution that precludes a noncharter county from issuing revenue bonds without an approving referendum to finance the acquisition or construction of authorized county buildings, payable solely from a portion of its annual share of race track and jai alai fronton funds distributed to it pursuant to F.S. Sections 550.13 and 550.14, F.S.A.
There is nothing in the general law or in any special law that precludes Orange County from issuing the revenue bonds here considered. On the contrary, there is delegated authority for implementing by ordinance the issuance of county bonds as hereinafter explained.
Since there is no such preclusion, Section 1(f) of Article VIII authorizes Orange County, a noncharter county, pursuant to enabling statutes to enact a county ordinance (in lieu of securing a special act to that effect) authorizing such a revenue bond issue. F.S. Section 125.01(1), (c), (r), (t), F.S.A., empowers noncharter counties in several self-government respects and clearly authorizes adoption of the bond ordinance herein. Thus there is no preclusion; instead, there is ample authority for the bond ordinance. Since F.S. Section 125.01(1)(r), F.S.A. delegated to Orange County the specific power to issue bonds and revenue certificates, it had the power to adopt its implementing ordinance in this instance.
There is little need for Section 125.01(1)(r) if a county still has to go to the Legislature to get special enabling legislation each time it wishes to issue bonds. The ordinance carefully tracks the enabling *312 authority of the cited statutes. Under these circumstances there was no reason for the county to go to the Legislature for a special act.
The unquestioned object of Section 1(f), Article VIII, is to authorize a "board of county commissioners of a county not operating under a charter [to] enact, in a manner prescribed by general law, county ordinances not inconsistent with general or special law ..." (Emphasis supplied.) For a definition of the meaning of the word, "inconsistent," in this context, see State ex rel. Dade County v. Brautigam, Fla., 224 So.2d 688.
Instead of going to the Legislature to get a special bill passed authorizing such building fund revenue bonds, the Orange County Commissioners under the authority of the 1968 Constitution and enabling statutes now may pass an ordinance for such purpose, as they did in this case, because there is nothing inconsistent thereto in general or special law. On the contrary, there is ample delegated authority for such purpose. The object of Article VIII of the 1968 Constitution was to do away with the local bill evil to this extent.
What Orange County is purporting to do here by ordinance has been done several times by other counties pursuant to authority of special enabling legislation. See, e.g., Tapers v. Pichard, 124 Fla. 549, 169 So. 39; Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799; Prescott v. Board of Public Instruction of Hardee County, 159 Fla. 663, 32 So.2d 731; State v. Board of Public Instruction, Okaloosa Co. (Fla.), 214 So.2d 723; State v. Gadsden County, (Fla.), 229 So.2d 587, and other cases.
F.S. Sections 130.01 and 130.012, F.S.A., prescribe the general law authority for the issuance of county bonds. If an ad valorem tax is to be levied to service such bonds or its taxing credit is otherwise pledged, an approval thereof by the electors is required. Section F.S. 130.03, F.S.A. and Section 12 of Article VII State Constitution. However, as indicated by the foregoing cases, if revenue bonds serviced by race track funds are involved no election is necessary. The Orange County ordinance, similarly as a special act might have done, pursuant to enabling law[1] authorized the issuance of the revenue bonds without the necessity of an election. There is nothing inconsistent with any general or special law in the Orange County ordinance pledging the County's portion of the race track funds for the service of such bonds or in not requiring an approving election for the issue.
The case of State v. County of Dade (Fla. 1970), 234 So.2d 651, only involved a construction of pertinent provisions of the 1968 State Constitution applying to a pledge of ad valorem taxes or spread of tax millage for the service of bonds and certificates of indebtedness of a local unit pursuant to F.S. Section 135.01, F.S.A.
It did not involve a pledge of excise tax revenues distributed to local units. Several cases succeeding State v. County of Dade have recognized this distinction. Compare State of Florida v. Division of Bond Finance, 246 So.2d 102 (Fla. 1971); Nohrr et al. v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla. 1971); Platts v. Division of Bond Finance, etc., 275 So.2d 231 (Fla. 1973); State v. Putnam County Development Authority (Fla.) 249 So.2d 6; and State of Florida v. Inter-American Center Authority (Fla.), 281 So.2d 201, opinion filed July 27, 1973. There is nothing in the 1968 State Constitution that abrogates the rule of earlier cases, e.g., State v. Town of Medley (Fla. 1964), 162 So.2d 257, and State v. Board of Public Instruction, Okaloosa County, supra, that "no election ... is necessary if the certificates of *313 indebtedness or revenue certificates are payable from excise taxes or sources other than ad valorem taxes."
Insofar as the holding in State v. Dade County, supra, 234 So.2d text 653, purported to overrule earlier bond cases not involving the pledging of ad valorem taxes, it is clearly obiter dictum. The majority in that case in quoting from Section 12 of Article VII of the 1968 State Constitution on page 653 failed to note that the certificates of indebtedness referred to in Section 12 are those "payable from ad valorem taxation" not from excise taxes.
The law is well settled that counties have delegated authority under the implementing and applicable provisions of F.S. Chapters 130 and 159, F.S.A., to issue bonds (including those pledging the county's taxing credit and revenue bonds) but that revenue bonds and certificates of indebtedness which do not pledge ad valorem taxes do not require an approving election.
Affirmed.
ROBERTS, ADKINS and McCAIN, JJ., concur.
BOYD, J., dissents with Opinion.
DEKLE, J., dissents with Opinion.
CARLTON, C.J., dissents and concurs with DEKLE, J.
BOYD, Justice (dissenting):
The effect of this bond issue would be to require the county to pay the bonds from the funds received from the race track and jai alai taxes, and obviously if the race track and jai alai taxes should be made unavailable to Orange County, or if for any reason the race track and jai alai taxes should not be available to the State, the bond holders would be entitled to be paid from other sources. There is no way in which Orange County can commit the Florida Legislature to continue collection or distribution of the taxes received from racing and jai alai, and, therefore, the probability arises in which the bond holders would have to rely upon the other sources of revenue. For the bonds to be valid under those conditions, necessarily the general credit of the county or the state would have to be pledged. As this Court held in 234 So.2d 651, no such bond issue pledging the general credit of the county or the state for building purposes in which the bonds would be payable within one year could be validly issued.
Obviously, the Legislature has not attempted to give Orange County such unlimited power to commit the Legislature, in its future taxing powers, and it is doubtful that the Legislature has the power to make an unconditional commitment to continue the assessment and collection of race track and jai alai taxes, nor to make a valid commitment as to the formula to be used in the distribution of the taxes among the sixty-seven counties.
DEKLE, Justice (dissenting):
This is a case of first impression in Florida and is an initial interpretation of our new 1968 constitutional provisions in Article VIII, §§ 1(f) and (g) distinguishing non-charter and charter county governments. For the reasons stated herein, my analysis is that non-charter counties do not have the power to issue the bonds here approved without the people's approval. I would reverse the final judgment of validation which does not require a referendum.
The powers of non-charter county government are controlled by Article VIII, § 1(f), of the Florida Constitution of 1968. According to its terms, non-charter governments "have such power of self-government as is provided by general or special law." Thus we must look to some general or special law to find the authority for the *314 county to act. Without such a law any act of the county would be ultra vires.
There is nothing in the schedule at § 6(b), art. VIII, or elsewhere, with reference to any "carry-over" power which can supply the authority for issuance of bonds. Reference therein to the general continuance of the "status of the counties of the state" refers of course to their retention as political subdivisions of the state unless changed by law (g). The subsequent express listing of the specific items such as "their status with respect to the legality of the sale of intoxicating liquors ...", "the county seats", etc., eliminates the possibility of other powers being "inferred" under the well-recognized rule of ejusdem generis, as well as the principles of constitutional construction.
Such an attempt by Ervin, J., in State v. County of Dade, 234 So.2d 651, 654 (Fla.1970), to supply the missing authority through the schedule, has already been rejected by this Court. (Two new Justices are now joining the two dissenters in Dade to reverse such earlier rejection.) Such an interpretation (enlargement, really) of the schedule is clearly contrary to the express new constitutional provisions in Art. VIII, §§ 1(f) and (g) for non-charter and charter governments respectively. It not only wipes out the obvious distinction between the two forms of government and the reasons for that distinction in first requiring the people's approval by voting for a charter, but in one fell swoop it authorizes all counties over the state to proceed arbitrarily with the issuance of bonds as they see fit, without voter or legislative approval but as a virtual independent sovereign which they are not. The very first words of the first section of the first article of our new 1968 Constitution are:
"All political power is inherent in the people. The enunciation herein of certain rights shall not be construed to deny or impair others retained by the people." (emphasis added)
If the people's Legislature, therefore, has not expressly granted a power, then (absent a charter) it remains with the Legislature, as here, or else requires the necessary voter approval.
A county obtains its power either through legislative enactment of its charter adopted by the people, or by direct legislative act, despite a limited "home rule" in the new constitution. The special authority to issue bonds by non-charter counties must be "provided by general or special law." (Art. VIII, § 1(f)) It is not a matter of proceeding unless "precluded" but is a matter of proceeding IF provided by law, as to a non-charter county such as Orange.
Appellee confuses the second provision (sentence) of Article VIII, § 1(f), with the above-quoted first provision. The second provision empowers a board of county commissioners not operating under a charter to enact county ordinances not inconsistent with general or special law. This, however, is only an authorization for ordinances implementing a power which has been granted by statute; it is not a separate source of power. The power of a non-charter county to act must find its genesis in a general or special act of the Legislature; the ordinance implementing that power is then enacted by the county commissioners and must not be inconsistent with general or special law.
To accept appellee's argument that the second provision of § 1(f) is also a source of power would eliminate a major difference between charter and non-charter governments. One of the distinguishing features of charter government is the power to act in the absence of a specific legislative enactment on the subject. This broad power to act on any subject not inconsistent with general or special law was not lightly granted by the framers of our constitution. Before such extensive power can be put in the hands of a board of county commissioners, the approval of the electorate is required. Fla. Const. art. VIII, § 1(c).
*315 The people of Orange County have not chosen to allow their board of county commissioners to operate with such latitude. Accordingly, the validation of the bonds in this case requires the existence of a general or special act authorizing the action.
Appellee, Orange County, concedes in its brief that:
"There is no statute, general or special, which either authorizes or restricts Orange County with respect to the issuance of revenue obligations to build county buildings and to pledge for their payment its share of the Race Track Funds." (p. 4 of brief of Appellee)
This admission, which my research has found to be absolutely correct, coupled with § 1(f) of Article VIII leads to the inescapable conclusion that Orange County (unchartered) is without the power to issue the bonds in question.
Reference to the commentary by one of the principal drafters of the new constitution, the Honorable Talbot "Sandy" D'Alemberte, reflects precisely the same meaning which is ascribed above to subsection (f) of Art. VIII, § 1, referring to non-charter governments, such as that involved here. Further research reveals that the original draft by the Constitutional Revision Commission proposed that which the county advocates. This was rejected and instead it was expressly made exactly "the reverse" as stated in the commentary, so that powers to county non-charter governments must find their genesis in an express act of the Legislature.[1] In the case of counties which have obtained the charter by vote of the people, such a grant by the *316 Legislature is usually included in that charter. This is the basic distinction between such two forms of county government; otherwise, there would be no point in having the two separate sections (f) and (g) for non-charter and charter governments which gave county residents a choice. The two forms of county government start, as the distinguished former legislator commented, "from different poles".
Tapers v. Pichard, 124 Fla. 549, 169 So. 39 (1936); Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799 (1941); and that continuing line of cases prior to the 1968 constitutional change were expressly overruled in our State v. County of Dade, supra. Prescott v. Board of Public Instruction, 159 Fla. 663, 32 So.2d 731 (1947); State v. Gadsden County, 229 So.2d 587 (Fla. 1969), and related cases did not deal with the basic question here as to a requirement for referendum.
The appellee's contention that dicta in Davis v. Gronemeyer, 251 So.2d 1 (Fla. 1971), is unduly restrictive and if adhered to by the court will effectively write § 1(f), art. VIII, out of the constitution, is totally without merit. Davis v. Gronemeyer dealt with § 6(d) of Article VIII, relating to the power of a county to repeal then existing special acts of the Legislature applying to it, which were in effect "ordinances". The language complained of must be read in the context of that opinion; the view expressed here is totally consistent with Davis v. Gronemeyer.
Section 125.01, Florida Statutes, F.S.A., is the powers and duties section of the county government chapter. Here we find several items which might arguably fulfill the requirement for a general law on the subject:
(c) provide and maintain county buildings;
(t) adopt ordinances and resolutions as may be necessary to exercise its powers;
(w) perform any other acts not inconsistent with law which are in the common interests of the county.
None of these items, however, is sufficiently definite to be accepted as a legislative enactment authorizing these bonds. They set forth functions and operations of county government generally. Nor is there specific authority for bond issues under § 125.01(1)(r), which contains general language authorizing the levy and collection of taxes and the issuance of "bonds, revenue certificates, and other obligations of indebtedness, which power shall be exercised in such manner, and subject to such limitations, as may be provided by general law." This authorizes the administrative execution and issuance of such instruments IF allowed "by general law" elsewhere, as earlier discussed. This language takes pains to state that such execution is subject to such legal "limitations."
The fact that no legislative authorization exists for these bonds is reinforced by the mere existence of Ch. 130, Fla. Stat., F.S.A. This chapter, entitled "County Bonds", spells out in detail the method whereby counties may issue bonds for, among other things, county buildings sought here. The approval of a majority of the voters in a proper election is expressly required. § 130.03. This comment does not reach the question of whether Ch. 130 pre-empts the subject of bond financing for county buildings, but we do note that Ch. 130 specifically authorizes bonds for county buildings and no other act of the legislature does. Ch. 130 sets forth all requirements and procedures. In view of the clarity of Ch. 130, it is difficult seriously to consider those sections of § 125.01 mentioned above as being concurrent authorizations (with Ch. 130) for bond financing of Orange County buildings.
This view is consistent with the scheme set up in the constitution for the financing of local government generally. Sec. 12, art. VII, Fla. Const., contains the policy of going to the electorate before pledging ad valorem taxes to repay bonds. Chapter 130 continues this policy. The principal is the same for bonds not pledging ad valorem taxes. We fail in our duty and oath to uphold the constitution by allowing the *317 will of the people thus to be by-passed. Sec. 550.14, Fla. Stat., F.S.A., directs the county to convert these race track funds into the county school fund or some other lawfully authorized fund. By allowing these funds to be diverted to other purposes for years into the future, the county school fund or other lawfully authorized funds must necessarily suffer.
"Robbing Peter to pay Paul", in this manner, can only result in extra strains on ad valorem tax receipts and thus indirectly affect our ad valorem taxes, thus doing indirectly what is expressly forbidden to be done directly by our constitution, statutes and our own former holdings.
Since I can find no legislative authorization for non-chartered Orange County to pledge its share of the race track and jai alai fronton funds, and since the Legislature has clearly provided authority in Chapter 130 for the bond financing of county building construction only by direct vote of the people, these bonds are, in my judgment, illegal and invalid.
I must accordingly most respectfully dissent.
NOTES
[*] See "The History and Status of local government powers in Florida" Univ. of Fla.Law Review Vol. XXV, Winter 1973, Number 2 pages 271 et seq. and particularly pages 288 to 294 incl. thereof.
[1] F.S. Section 125.01(1)(r) F.S.A. read in connection with F.S. Chapters 130 and 159, F.S.A. together with Article VII State Constitution prescribe the enabling authority for the issuance of county bonds.
[1] Fla. Const. art. VIII, § 1 (1968), Commentary by Talbot "Sandy" D'Alemberte, Esq., 26A F.S.A. 270, states:

"Subsection (f). [Non-charter government] This subsection embodies several new provisions which were proposed in a different manner by the Constitutional Revision Commission. That recommendation was that `counties shall have the power of self-government except as otherwise provided by general or special law.' The reverse is now the case under this subsection which provides that counties shall have such powers of self-government as is provided by general or special law. Absent special or general legislation counties have no constitutional powers under this subsection.
"The first sentence in this subsection provides that powers may be delegated to county governments by general or special law. The second sentence is somewhat inconsistent with the first, however, in that the authority of the county commissioners in non-charter counties to enact ordinances shall be `in a manner prescribed by general law.' In any case, county governments may be delegated or granted powers by the legislature to operate as self-governing units even to the extent of having jurisdiction over municipal ordinances when a charter is adopted (see next subsection). Absent a charter, the county government may be delegated all powers of self-government except the power over municipal ordinances. The county may adopt ordinances, if provided by general law, not inconsistent with general or special law.
"Subsection (g). This entirely new subsection provides for the broadest extent of county self-government or `home rule' as it is commonly described. It was taken with only editorial changes from the Revision Commission recommendation.
"Under subsection (c) of this section, charter governments may be established, amended or repealed only by general or special act which is approved by a vote of the electors of the county at a special election called for that purpose.
"As a result of the provisions of subsection (f) of this section (non-charter government), the power which may be granted to county governments under a charter is the power to have county ordinances take precedence over municipal ordinances. Also, where the non-charter government may be empowered by the legislature to adopt ordinances not inconsistent with general or special law, the charter counties may adopt ordinances as long as they are not inconsistent with general law.
"Counties operating under a charter are presumptively considered to have the broad powers of self-government (with the exception of precedence over municipal ordinances which must be provided in the charter) unless provided otherwise by general law or by the special law adopting the charter. Thus, charter counties and non-charter counties apparently start from different poles in their relationships with legislative enactments. Both could, conceivably, be the same depending on the legislation adopted." (emphasis added)