M. A. Galbraith, Jr. City Attorney Boca Raton
QUESTION:
May the City of Boca Raton finance the purchase of a computer under an agreement which grants a finance company-assignee of the agreement a security interest in the computer without the approval of the voters of the City of Boca Raton?
SUMMARY:
Until judicially determined to the contrary, the City of Boca Raton may not finance the purchase of a computer under a sale and purchase agreement and financing arrangement granting a security interest in the equipment, with an accompanying right of foreclosure or other remedy at law or in equity to enforce the performance of the city's obligations under such agreement and financing arrangement, or to hold the city liable for any deficiency should default occur and for any costs, expenses, and attorney's fees incurred in connection with the lender/assignee's enforcement of its rights under such contractual device; any such contractual financing plan must first have been approved by the electors of the city as mandated by s. 12(a) of Art. VII, State Const.
Under the terms of the proposed agreement attached to your letter of inquiry, the City of Boca Raton agrees to make all payments as required under the agreement when due for the purchase of a computer. The city further covenants to `take such actions as are necessary under the laws of Florida to plan and budget for receipt of a sufficient appropriation of funds to discharge its obligation to make all payments required' under the agreement when due. The contract further provides that if the city has not appropriated sufficient funds to enable it to continue making the payments required under the agreement and it is without any other funds which it might lawfully expend to continue making such payments,then the agreement may be terminated effective upon expiration of the fiscal year in which sufficient funds were last appropriated to satisfy the city's obligations under the agreement. The contract does not, however, contain any disclaimer as to the city obligating its credit or taxing power to secure performance of the terms of the contract or with respect to the enforcement thereof. Payments under the agreement include interest and, according to schedule B attached to the proposed agreement, may cover a term of 24-60 months. While, under the proposed agreement, title to the computer is conveyed to the city as purchaser upon the city's acceptance of the equipment, schedule B (which is not referred to or incorporated in the covenant on the sale and purchase to equipment) speaks in terms of a `lease' and provides that the equipment is owned outright by the city after the last `monthly lease payment.' The divergent terms used within the agreement and attached schedule thus inhibit a precise characterization of the proposed agreement.
To secure payment and the performance and observance of the covenants expressed or implied in the agreement, the seller is granted and conveyed a `security interest' in the equipment, which interest terminates upon purchaser having made all payments due under the agreement. From the agreement, however, it appears that, concurrent with the execution of the proposed contract, the seller has assigned all its rights and interests, including its security interest in the equipment, to a party hereinafter referred to as the `assignee.' While the assignee has full benefit of all covenants made by the city as purchaser and all rights and remedies of the seller contained therein, the city does not have the right or power to assign its rights or to delegate its duties and obligations under the agreement without the prior consent of the assignee.
Although the city may terminate the agreement on June 30 of each contract year upon payment of a termination payment or by failing after the initial fiscal year to appropriate sufficient funds to continue making the contractually required payments if the city is without any other funds from which it might make such payments (such termination to be effective upon the expiration of the fiscal year in which sufficient funds to satisfy the city's obligations under the agreement were last appropriated), the assignee has `all the rights and remedies available to a secured creditor in default under the Florida Uniform Commercial Code with respect to obtaining possession of any equipment affected by discontinuation of such payments . . . .' Moreover, upon any default by the city as specified within the agreement, the assignee has the express right to reenter and take possession of the equipment and to sell, lease, or sublease it, holding the city liable for all payments up to the effective date of such selling, leasing, or subleasing as well as for any deficiency resulting from the difference in the purchase price, rental, and other amounts paid by a purchaser, lessee, or sublessee pursuant to such sale, lease, or sublease and the sum required to be paid under the agreement, returning to the purchaser any surplus resulting therefrom; or the assignee may `[t]ake whatever action at law or in equity may appear necessary or desirable to collect the payments then due and thereafter to become due or to enforce performance and observance of any obligation, agreement or covenant of Purchaser under this agreement.' The purchaser further agrees to pay the seller (and its assignee) all costs and expenses, including attorney's fees awarded by an administrative tribunal or court of competent jurisdiction, reasonably incurred in connection with the enforcement of the seller's (and its assignee's) rights under the agreement. The city is responsible for providing insurance on the equipment under the city's program of self-insurance, if any, or from an insurance carrier acceptable to the assignee; `[e]ach policy of insurance shall be endorsed with a standard mortgage or security interest clause for the benefit of the seller [assignee] and shall name seller [assignee] as primarily insured, as their interests may appear.' All modifications, repairs, alterations, additions, replacements, substitutions, operating accessories, and controls (made by the purchaser at purchaser's cost and expense) by the terms of the agreement accrue to the equipment and become subject to the security interest given by the purchaser to the seller (and its assignee).
It is clear that the governing body of a municipality possesses the power to borrow money, contract loans, and issue bonds as defined in s. 166.101, F. S., to finance the undertaking of any capital or other project for purposes permitted by the State Constitution and to pledge the funds, credit, property, and taxing power of the municipality for the payment of such debts and bonds. Section 166.111, F. S. See s. 166.101(1), defining the term `bond' to include notes, mortgage certificates, or other obligations or evidences of indebtedness of any type or character; and s.166.101(4), defining the term `revenue bonds' to mean `obligations of the municipality which are payable from revenues derived from sources other than ad valorem taxes . . . and which do not pledge the property, credit, or general tax revenue of the municipality.' (Emphasis supplied.) Cf. Orange County Civic Facilities Authority v. State, 286 So.2d 193 (Fla. 1973). See also s. 166.121(1), F. S., which provides that bonds (as defined by s. 166.101(1)), issued under part II of ch. 166, F. S., shall be authorized by resolution or ordinance of the governing body `and, if required by the State Constitution, by affirmative vote of the electors of the municipality. . . .'
The Constitution does not require approval by the electors when a municipality's obligations or evidences of indebtedness of any type or character are payable solely from taxes or sources other than ad valorem taxes and do not otherwise, directly or indirectly, pledge the municipality's property, credit, or general taxing power. Cf. State v. Board of Public Instruction of Okaloosa County, 214 So.2d 723 (Fla. 1968); State v. Orange County,281 So.2d 310 (Fla. 1973), in which the court upheld the issuance of capital improvement bonds without an election to finance the acquisition and construction of authorized county buildings by a noncharter county payable solely from the county's share of racetrack and jai alai funds; and Orange County Civic Facilities Authority v. State, supra. Thus, if the money borrowed for the purchase of the computer is repaid solely from non-ad valorem revenues, no approving election or referendum would be requiredprovided that the municipality's credit, property, or general tax revenue is not otherwise pledged.
Under the proposed agreement in the instant inquiry, however, the assignee has a security interest in the equipment being purchased. The agreement specifically provides:
 To secure payment of the payments due from Purchaser and to secure the performance and observance by Purchaser of all covenants expressed or implied in this Agreement, Purchaser does hereby assign, grant bargain, and convey a security interest in the Equipment to Seller. Said security interest shall terminate upon Purchaser's having made all payments due hereunder.
The term `security interest' is generally defined in s.671.201(37), F. S., as amended by s. 2, ch. 79-398, Laws of Florida, effective January 1, 1980, for Florida's Uniform Commercial Code (chs. 671-679, F. S.), subject to additional definitions which may be contained in the code which are applicable to specific chapters and unless the context otherwise requires, to mean:
 . . . an interest in personal property or fixtures which secures payment or performance of an obligation. The retention or reservation of title by a seller of goods notwithstanding shipment or delivery to the buyer (s. 672.401) is limited in effect to a reservation of a security interest. . . . Whether a lease is intended as security is to be determined by the facts of each case; however, (a) the inclusion of an option to purchase does not of itself make the lease one intended for security, and (b) an agreement that upon compliance with the terms of the lease the lessee shall become or has the option to become the owner of the property for no additional consideration or for a nominal consideration does make the lease one intended for security. (Emphasis supplied.)
While the proposed agreement provides that, upon acceptance of the computer, title vests in the city and thereafter remains vested in the purchaser, the relevance of title to goods between buyer and seller has been deemphasized. See, e.g., s. 672.401(2), F. S., which provides that `[u]nless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest . . . .' See also s. 679.202, F. S. (provisions of chapter with regard to rights, obligations, and remedies applicable whether title to collateral is in secured party or in debtor), and 79 C.J.S. Supp.Secured Transactions s. 8.
Chapter 679, F.S. (Art. 9 of the Uniform Commercial Code, hereinafter UCC), controls the rights and remedies available in secured transactions which constitute any transaction intended to create a security interest in personal property or fixtures regardless of its form or name or designation given to it by the parties. See s. 679.113, providing that a seller's (or his assignee's) security interest is governed by the provisions of ch. 679 if the debtor is in possession of the goods. Section 679.102 provides in part that the chapter is applicable to `security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security.' See s. 679.107, regarding purchase money security interests in which the loan of money is used to acquire the collateral. Since, however, a security interest is a consensual device, the provisions of ch. 679 do not apply to statutory liens except as provided in s. 679.310.
The single term `security interest' therefore substitutes for a `variety of descriptive terms which have grown up at common law and under a hundred-year accretion of statutes.' Comment, Uniform Commercial Code s. 9-101. It appears, however, that a security interest may be analogous to or the equivalent of a consensual lien in personalty. See 68 Am. Jur.2d Secured Transactions s. 36 n. 85, which states that the UCC definition of security interest is derived to a certain extent from the Uniform Trust Receipts Act which defined the term `security interest' as meaning a property interest in goods, documents, or instruments, limited in extent to secure performance of some obligation of the trustee or of some third person to the entruster and including the interest of a pledge. The present UCC definition of `security interest' provides that it is an interest in property or fixtures. See also
Georgia-Pacific Corp. v. Consolidated Suppliers, Inc.,332 So.2d 368 (1 D.C.A. Fla., 1976) (execution and filing of lien on motor vehicle with Department of Highway Safety and Motor Vehicles constitutes a `secured transaction' under ch. 679, F. S.). Cf. Inre King Furniture City, Inc., 240 F. Supp. 453 (E.D.Ark. 1965) (real estate lease giving lessor a contractual lien on all property chattels or merchandise in leased premises is a contractual lien on personal property and such lien is subject to Arkansas UCC). See generally 79 C.J.S. Supp. Secured Transactions
s. 7 (although term `security' may denote a lien, it is also used in a broader sense and in such sense whenever the performance of some undertaking is necessary to secure or preserve the value of some asset or other agreement); accord: Tahoe National Bank v. Phillips, 480 P.2d 320 (Cal. 1971). See generally part III, ch. 679, regarding perfecting security interests and the priority of claims.
Moreover, under the provisions of part V, ch. 679, F. S., which prescribes some of the remedies available upon default, a secured party may take possession of the collateral after default, see s. 679.503, and may sell or dispose of the collateral in a commercially reasonable manner, see s. 679.504. See also s. 679.501, and Slomovic v. Petryk, 341 So.2d 208 (4 D.C.A. Fla., 1977) (provisions of UCC dealing with secured transactions provide cumulative remedies in event of debtor's default including provision that secured party may reduce his claim to judgment, foreclose, or otherwise enforce security interest by any available judicial procedure); cf. MGD Graphic Systems, Inc. v. New York Press Publishing Co., Inc., 383 N.Y.S.2d 606 (N.Y.S.Ct. 1976),affirmed, 398 N.Y.S.2d 657 (N.Y. 1977) (seller with perfected security interest entitled to immediate possession of collateral upon buyer's default notwithstanding that express right to immediate possession of collateral did not appear in default provision of contract). See generally Marine Midland Bank-Central v. Cote, 351 So.2d 750 (1 D.C.A. Fla., 1977). The remedies prescribed in the UCC (chs. 671-679, F. S.) are to be liberally administered to the end that the aggrieved party may be put in as good a position as if the other party had fully performed. Section671.106. See also s. 672.701, providing that the remedies for breach of any obligation collateral or ancillary to a contract for sale are not impaired by the provisions of the chapter; and Comments 1 and 6 to UCC s. 9-501 (s. 679.501), which state that the secured party, upon the buyer's default, has all the rights and remedies under the express provisions of the UCC and, except as limited by the code, those provided in the agreement or the secured party may enforce its interest by any judicial procedure outside of Art. 9 of the UCC which state law may permit.
A lien has been generally defined as a charge or encumbrance on property such that the property itself may be proceeded against and the proceeds applied to the debt. See generally Phillips v. Atwell, 80 So. 180 (Fla. 1918) (a lien is a charge upon personal property for the payment of a debt or duty), and 53 C.J.S. Liens
s. 1. The term `security interest' is defined in s. 671.201(37), F. S., to mean an interest in personal property or fixtures which secures the payment or performance of an obligation. Under the proposed agreement granting the assignee a security interest in the computer (and all accretions) being purchased by the city, the assignee is expressly authorized, upon the city's default, to reenter and take possession of the computer and to sell or otherwise dispose of it, holding the city.
 liable for all payments up to the effective date of such selling, leasing or subleasing as well as for any deficiency resulting from the difference resulting in the purchase price, rental and other amounts paid . . . pursuant to such sale, lease or sublease and the sum required to be paid hereunder . . . .
Any surplus resulting from any such sale or other disposition of the equipment is to be returned to the city as purchaser. Moreover, the assignee is also authorized to take whatever action at law or in equity necessary or desirable to enforce the city's performance of its obligations under the agreement or any covenant therein. It thus appears from the provisions of the proposed agreement and the Uniform Commercial Code that the security interest given to the assignee/lender in the instant inquiry is the functional equivalent of a lien or mortgage upon the equipment. The courts of this state and this office have previously considered whether a municipality may place a lien or mortgage on property to be purchased or on other municipal assets or property as security for a loan without holding an approving election or referendum. In Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304, 310 (Fla. 1971), the Supreme Court stated:
 Commencing with the case of Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558 (1935), the Court without exception has held that revenue bonds secured by a mortgage on the physical properties to be financed could not *3987 be issued by public bodies unless approved at an election.
Continuing at page 311, the court stated:
 While perhaps the county would experience no coercion to levy a tax to prevent the foreclosure of the project leased to this nonprofit corporation in the event of a default; yet, such would not be the case if these bonds were issued to finance a project for Brevard Junior College or for the University of Florida. Most certainly the county or the legislature would feel morally compelled to levy taxes or to appropriate funds to prevent the loss of those properties through the process of foreclosure.
 With certain exceptions not pertinent to the case sub judice, a mortgage with the accompanying right of foreclosure is not constitutionally permissible without an election. . . . Consistency is desirable and absent specific constitutional authority a mortgage securing revenue bonds of a public body should not be approved without an election.
See generally Betz v. Jacksonville Transportation Authority,277 So.2d 769 (Fla. 1973); State v. Putnam County Development Authority, 249 So.2d 6 (Fla. 1971); Hollywood, Inc. v. Broward County, 90 So.2d 47 (Fla. 1956); and see Clover Leaf, Inc. v. City of Jacksonville, 199 So. 923 (Fla. 1940), which holds that municipalities cannot borrow money under a contractual device for repayment (even if expressly provided that there shall be no general liability) providing that the lender shall look solely to the pledged municipal property or assets as security for any financial obligation or in any way, directly or indirectly, obligate the municipality's credit or coerce the use of its taxing power without a referendum. See also AGO's 076-121 and 073-164, stating that a deferred payment plan created a conditional indebtedness on the part of the county (or municipality) in the nature of a legal liability for a capital venture predicated upon the general credit of local government; the plan placed the county (or municipality) in a position of being coerced into levying a tax in order to prevent the loss of the property by foreclosure and was not permissible without an approving referendum.
Although the courts have generally considered this issue in terms of real property or the improvements made thereupon, such as the construction of public buildings or facilities or public works, the principles enumerated therein are, in my opinion, applicable to any asset, property, or property rights of a municipality. See
Betz v. Jacksonville Transportation Authority, supra, in which the court considered whether the management and bus system purchase contracts, which presumably included personalty, required approval by the electorate under the principles set forth in Nohrr v. Brevard County Educational Facilities Authority, supra, and the cases cited therein. Since `[t]here is nothing in these contracts creating a mortgage or lien obligation upon the bus system properties or upon the bus system revenues which would ultimately entitle City Coach Lines, Inc. or Jacksonville Coach Company or others to bring foreclosure or receivership proceedings,' the court determined that an election or referendum was not mandated.See AGO 078-110 concluding that a municipality may not finance the purchase of a fire truck by pledging non-ad valorem revenues if it gave a lien or mortgage on the property to be purchased (or other assets or property of the city) as security for the loan without an approving referendum, and s. 166.101(4), F. S., defining revenue bonds as obligations payable from revenues derived from sources other than ad valorem taxes on real or tangible personal property and which do not pledge the property, credit, or general tax revenue of the municipality. The issue is not whether real or personal property is involved, but whether a municipality may be coerced to levy a tax in order to prevent the loss of an asset of the city. Although the equipment may be a depreciable asset, it is property for which public funds have been expended and which is owned and title thereto held by the municipality and which is subject to being foreclosed upon or lost. Moreover, if a deficiency judgment is obtained against the city, whether at law or in equity, such a judgment including such costs, expenses, and attorney's fees which under the terms of the contract may be imposed would constitute a debt of the city, thereby involving the city's credit. Furthermore, the instant agreement cannot be considered or treated as a lease-purchase agreement, title having passed to the city upon delivery of the computer and in view of the several remedies available to the assignee/lender at its option under the agreement such as the enforcement of any deficiency or judgment therefor against the city or such other actions at law or in equity which the assignee/lender may consider necessary or desirable to enforce performance of the agreements and its covenants.
In one case, City of Jacksonville v. Savannah Machine and Foundry Co., 47 So.2d 634 (Fla. 1950), the court held that a certificate of indebtedness issued by a city as evidence of deferred payments to be made out of authorized budgetary appropriations and secured by personal property owned by the city did not constitute bonds within the meaning of s. 6, Art. IX, State Const. 1885 (the precursor of s. 12(a), Art. VII, State Const. 1968), requiring the approval of the electorate. This decision, however, and the line of cases upon which it relied, was based upon the only exception under s. 6, Art. IX, State Const. 1885, recognized by the Florida courts. See, e.g., Tapers v. Pichard, 169 So. 39 (Fla. 1936) (s. 6, Art. IX, State Const. 1885, has no application to contracts for current governmental needs when executed in due course of authorized budgetary requirements), and Leon County v. State,165 So. 666 (Fla. 1936). See also Clover Leaf, Inc. v. City of Jacksonville, 199 So. 923, 925 (Fla. 1941), in which the court cited the rule set forth in Boykin v. Town of River Junction,164 So. 558 (Fla. 1935), and further stated:
 [T]he only exception we have recognized is that a municipal corporation may extend, enlarge or improve a then existing utility which it owns in its proprietary or corporate capacity, and restrict the retirement of the obligations incurred for that purpose to the income received from it.
This essential or current governmental needs exception, however, and such financial arrangements adopted thereunder, is no longer permissible under the Constitution. See State v. County of Dade,234 So.2d 651, 653 (Fla. 1970), in which the Supreme Court stated:
 The present Constitution is clearly more restrictive and expresses the will of the people that financial arrangements of the type formerly upheld in the Tapers v. Pichard line of cases be no longer permitted. The language of Section 12, Article VII [State Const. 1968] is plain.
See also Mize v. County of Seminole, 229 So.2d 841 (Fla. 1969), which implicitly recognized that the essential or current governmental needs exception under the 1885 Constitution was no longer permissible under the 1968 Constitution. Cf. Betz v. Jacksonville Transportation Authority, supra, and Nohrr v. Brevard County Educational Facilities Authority, supra. Moreover, the proposed agreement in the instant inquiry differs from the plan discussed in City of Jacksonville v. Savannah Machine and Foundry Co., supra. No provision is made in the instant agreement as to which funds are to be appropriated, budgeted for, or used in making the contractually required payments, nor is there any disclaimer as to the city's obligating its credit or taxing power to secure performance of the terms of the contract. Unlike the plan described in City of Jacksonville v. Savannah Machine and Foundry Co., the agreement provides that the assignee may take whatever action at law or in equity it considers necessary or desirable to collect payments then due or thereafter to become due or to enforce performance and observance of any obligation, agreement, or covenant of the city under the agreement. Furthermore, if the assignee, upon default, takes possession of the equipment and sells, leases, or subleases such equipment, the agreement expressly provides that the assignee may hold the city liable for any deficiency resulting from the difference in the purchase price, rental, and other amounts paid by a purchaser, lessee, or sublessee pursuant to such sale, lease, or sublease and the sum required to be paid under the agreement. Such liability or judgment therefor would constitute a debt of the city, jeopardizing the city's general credit and funds. Under such provisions, it appears clear that the city could be coerced into levying an ad valorem tax and having the proceeds applied directly to the extinguishment of the debt in order to avoid loss of the equipment or to prevent the foreclosure thereof.
Prepared by: Joslyn Wilson, Assistant Attorney General