392 So.2d 875 (1980)
The STATE of Florida et al. and Homeowners and Tenants Protective Association, Inc., Etc., Appellants,
v.
MIAMI BEACH REDEVELOPMENT AGENCY, etc., Appellee.
No. 57997.
Supreme Court of Florida.
December 11, 1980.
Rehearing Denied February 11, 1981.
*878 Janet Reno, State Atty., and Milton Robbins, Asst. State Atty., Miami, for appellants.
W. Robert Olive, Jr. and Hugh M. Taylor of Bryant, Miller & Olive, Tallahassee, and Murray H. Dubbin of Dubbin, Schiff, Berkman & Dubbin, Miami, for appellee.
Joseph A. Wanick, Miami, for intervening appellant.
William S. Turnbull, Orlando, and Fred W. Baggett of Roberts, Miller, Baggett, LaFace, Richard & Wiser, Tallahassee, for Florida Downtown Development Ass'n, amicus curiae.
PER CURIAM.
This cause is before the Court on appeal of a judgment of the Circuit Court of the Eleventh Judicial Circuit, in and for Dade County, validating bonds proposed for issue by the Miami Beach Redevelopment Agency. The State of Florida and intervenors appeal; we have jurisdiction. Art. V, § 3(b)(2), Fla. Const.; § 75.08, Fla. Stat. (1979). We affirm the judgment of the trial court.
The Miami Beach Redevelopment Agency was created by the commission of the city of Miami Beach pursuant to the Community Redevelopment Act of 1969, chapter 69-305, Laws of Florida, codified as chapter 163, part III, Florida Statutes (1975). The act was amended in 1977 to authorize "tax increment financing" of community redevelopment projects without referendum. Ch. 77-391, Laws of Fla.; see ch. 163, pt. III, Fla. Stat. (1977).
The State Attorney of the Eleventh Judicial Circuit, on behalf of the state, has raised a number of issues on appeal of the validation decree.
Section 163.335(1), Florida Statutes (1977), declares that slums and blighted areas in the state are "a serious and growing menace, injurious to the public health, safety, morals, and welfare... ." It states further that the existence of slums and blighted areas contributes to "the spread of disease and crime... ." Such areas are "an economic and social liability imposing onerous burdens which decrease the tax base and reduce tax revenues," and their existence "impairs or arrests sound growth, retards the provision of housing accommodations, aggravates traffic problems and substantially hampers the elimination of traffic hazards and the improvement of traffic facilities; ...." Finally, subsection (1) finds and concludes
that the prevention and elimination of slums and blight is a matter of state policy and state concern in order that the state and its counties and municipalities shall not continue to be endangered by areas which are focal centers of disease, promote juvenile delinquency, and consume an excessive proportion of its revenues because of the extra services required for police, fire, accident, hospitalization, and other forms of public protection, services, and facilities.
Section 163.335(2) contains a declaration of the range of public policy responses that are deemed appropriate in dealing with the problems of slums and blight. Some slums and blighted areas "can be conserved and rehabilitated through appropriate public action... ." By the "means provided in this part," such conservation or rehabilitation may be effected so as to eliminate, remedy, or prevent the "evils enumerated." Other slums and blighted areas, in contrast, "or portions thereof, may require acquisition, clearance, and disposition subject to use restrictions, as provided in this part, since the prevailing condition of decay may make impracticable the reclamation of the area by conservation or rehabilitation."
*879 Section 163.335(3) finds and declares that redevelopment as contemplated by the act is a public purpose for which public funds may be expended and the power of eminent domain and the police power exercised.
Section 163.340(7) defines a slum as follows:
(7) "Slum area" means an area in which there is a predominance of buildings or improvements, whether residential or nonresidential, which by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, the existence of conditions which endanger life or property by fire or other causes, or any combination of such factors is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency, or crime and is detrimental to the public health, safety, morals, or welfare.
The act defines a blighted area as follows:
(8) "Blighted area" means an area in which there are a substantial number of slum, deteriorated, or deteriorating structures and conditions which endanger life or property by fire or other causes or one or more of the following factors which substantially impairs or arrests the sound growth of a county or municipality and is a menace to the public health, safety, morals, or welfare in its present condition and use:
(a) Predominance of defective or inadequate street layout;
(b) Faulty lot layout in relation to size, adequacy, accessibility or usefulness;
(c) Unsanitary or unsafe conditions;
(d) Deterioration of site or other improvements;
(e) Tax or special assessment delinquency exceeding the fair value of the land; and
(f) Diversity of ownership or defective or unusual conditions of title which prevents the free alienability of land within the deteriorated or hazardous area.
§ 163.340(8), Fla. Stat. (1977).
The essential difference between the two concepts as defined by the legislature is that a slum is an area where conditions actively and directly menace the essential public order while a blighted area is one where conditions are not conducive to sound growth and the public good is impaired by the various impediments to such growth.
Section 163.350 provides that general purpose local government units  counties and municipalities  may, for the purposes of the act, formulate "a workable program for utilizing appropriate private and public resources to eliminate and prevent the development or spread of slums and urban blight." To the objectives of encouraging needed community rehabilitation and providing for the redevelopment of slums and blighted areas, the statute again indicates a range of responses that may be appropriate:
Such workable program may include provision for the prevention of the spread of blight into areas of the county or municipality which are free from blight through diligent enforcement of housing, zoning, and occupancy controls and standards; the rehabilitation or conservation of slum and blighted areas or portions thereof by replanning, removing congestion, providing parks, playgrounds and other public improvements, encouraging voluntary rehabilitation, and compelling the repair and rehabilitation of deteriorated or deteriorating structures; and the clearance and redevelopment of slum and blighted areas or portions thereof.
§ 163.350, Fla. Stat. (1977).
Section 163.355 requires that, in order for a county or municipality to exercise the authority conferred by the act, its governing body must find and declare by resolution that: (1) one or more slums or blighted areas exist within its boundaries and (2) that rehabilitation, conservation, "redevelopment," or a combination thereof is necessary "in the interest of the public health, safety, morals, or welfare of the residents of such county or municipality."
After having made such a finding of necessity, the governing body of the county or municipality may create a community redevelopment *880 agency, separately constituted if necessary under section 163.356, or it may constitute itself as the community redevelopment agency. § 163.357. The agency's authority includes "all the powers necessary or convenient to carry out and effectuate the purposes and provisions of this part," except that the governing body of the county or municipality retains the power to: (1) designate an area as a slum or blighted, determine the appropriateness of a redevelopment project, and hold public hearings on these matters; (2) finally approve redevelopment plans; (3) authorize the issuance of bonds; and (4) approve the acquisition, demolition, removal, or disposal of property and assume responsibility for losses. § 163.358.
In a chartered county, the powers conferred by the act are conferred on the county governing body. The county may, however, delegate the redevelopment powers to a municipality within its boundaries. § 163.410.
Section 163.360 provides that, once the county or municipal governing body has determined that an area is a slum or is blighted, and has designated it as appropriate for redevelopment, it may adopt a redevelopment plan by following the steps and procedures outlined in the act. A community redevelopment "plan" is a description of a community redevelopment "project." It must indicate any acquisition, demolition, and removal of structures, as well as any improvements to be constructed and land uses provided for after redevelopment. In considering any proposed redevelopment plans, and before adopting one, the governing body must hold public hearings. The act requires detailed findings on the propriety of a proposed redevelopment plan.
Section 163.370 provides that the redevelopment powers conferred include the authority to carry out projects involving the acquisition of slums and blighted areas, the demolition of buildings, the construction of streets, utilities, parks, playgrounds, and other improvements, disposition of properties at market value, programs of voluntary rehabilitation, and rehabilitation and sale of acquired structures.[1]
The governing body's findings must include, § 163.360(6)(a), and the redevelopment project may include, consideration of the problem of and provision for relocation of displaced residents of the redevelopment area. § 163.370(1)(i).
In section 163.375, the act provides that counties, municipalities, and redevelopment agencies shall have the power of eminent domain to effectuate the purposes of the act. That is, they may "acquire by condemnation any interest in real property, including a fee simple title thereto, which it may deem necessary for, or in connection with, a community redevelopment project and related activities under this part." § 163.375(1). In eminent domain proceedings, evidence of illegal or nonconforming uses and conditions, and their effect on the value of the property, are declared to be admissible in evidence. § 163.375(2), (3).
The community redevelopment agency, after having acquired property in connection *881 with a redevelopment project, may sell, lease, otherwise transfer, otherwise dispose of, or retain such property for use in accordance with use restrictions imposed to effect the purpose of the redevelopment plan. § 163.380(1). The property must be disposed of at market value, § 163.380(2), and there must be public notice of the opportunity for interested persons to participate in redevelopment.
Section 163.385 provides the authority for the issuance of bonds to finance redevelopment projects. It provides in part that, "[t]he security for such bonds may be based upon the anticipated assessed valuation of the completed community redevelopment project and such other revenues as may be legally available." Subsection (2) provides:
Bonds issued under this section shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction, and shall not be subject to the provisions of any other law or charter relating to the authorization, issuance, or sale of bonds. Bonds issued under the provisions of this part are declared to be issued for an essential public and governmental purpose and, together with interest thereon and income therefrom, shall be exempted from all taxes, except those taxes imposed by chapter 220 on interest, income, or profits on debt obligations owned by corporations.
§ 163.385(2).
The act provides as the mechanism for the financing of projects that each redevelopment agency shall establish a redevelopment trust fund. The governing body of the local government unit must, before the exercise of any redevelopment powers, provide by ordinance for the funding of the trust fund. § 163.387(1), Fla. Stat. (1977). This subsection provides further:
The annual funding of the redevelopment trust fund shall be in an amount not less than that increment in the income, proceeds, revenues, and funds of the county or municipality derived from or held in connection with its undertaking and carrying out of community redevelopment projects under this part. Such increment shall be determined annually and shall be that amount equal to the difference between:
(a) The amount of ad valorem taxes levied each year by all taxing authorities except school districts on taxable real property contained within the geographic boundaries of a community redevelopment project; and
(b) The amount of ad valorem taxes which would have been produced by the rate upon which the tax is levied each year by or for all taxing authorities except school districts upon the total of the assessed value of the taxable property in the community redevelopment project as shown upon the [most recent] assessment roll used in connection with the taxation of such property by each taxing authority [prior] to the effective date of the ordinance approving the community redevelopment plan.
When a redevelopment trust fund has been established, all taxing authorities in the redevelopment area except school districts must annually appropriate the ad valorem tax increment to the trust fund. § 163.387(2). The obligation to contribute annually to the trust fund continues until the retirement of all debt incurred in connection with the project, but "only to the extent that the tax increment described in this section accrues." § 163.387(3). That is, the obligation to appropriate to the fund arises only if the increment in tax revenue is actually collected. § 163.387(4).
The act disclaims any right of bondholders to receive the taxing authorities' contributions until they are deposited in the redevelopment trust fund. "The holders of such bonds or notes shall have no right to require the imposition of any tax or the establishment of any rate of taxation in order to obtain the amounts necessary to pay and retire such bonds or notes." Id.
Section 163.387 contains a final disclaimer:
Revenue bonds issued under the provisions of this part shall not be deemed to constitute a debt, liability, or obligation *882 of the local governing body or the state or any political subdivision thereof, or a pledge of the faith and credit of the local governing body or the state or any political subdivision thereof, but shall be payable solely from the revenues provided therefor. All such revenue bonds shall contain on the face thereof a statement to the effect that the agency shall not be obligated to pay the same or the interest thereon except from the revenues of the community redevelopment agency held for that purpose and that neither the faith and credit nor the taxing power of the local governing body or of the state or of any political subdivision thereof is pledged to the payment of the principal of, or the interest on, such bonds.
Id. § 163.387(5).
The Miami Beach Redevelopment Agency's complaint sought validation of $80 million in bonds to finance land acquisition and $300 million in bonds to finance improvements. In the judgment of validation, the court stated its findings, which we summarize as follows.
On February 19, 1975, the Miami Beach City Commission adopted a resolution declaring that the south end of the city, as described in the resolution, is a "blighted area" within the meaning of the Community Redevelopment Act. The judgment of validation declares that this resolution, although adopted with a minimum of formality and evidence, is supported by the presumption that the commissioners were knowledgeable about conditions in their city. On February 17, 1976, the city commission created the Miami Beach Redevelopment Agency. On February 1, 1977, the Dade County Commission delegated to the city the redevelopment powers provided for by the Community Redevelopment Act.
Meanwhile, the Miami Beach Redevelopment Agency prepared a redevelopment plan for the project area in the south end of the city. In January, 1977, the city planning board found the plan to conform to the city's general plan. On March 2, 1977, the city commission approved and adopted the redevelopment plan.
On July 1, 1977, chapter 77-391, Laws of Florida, amending the act to provide for tax increment financing, went into effect. On September 7, 1977, the city commission established a redevelopment trust fund and appropriated thereto the tax increment revenues to be realized from the redevelopment project.
In January, 1978, the county commission approved the redevelopment plan. On April 4, 1978, the county commission by resolution joined in the city's creation of the redevelopment trust fund and appropriated to it the tax increment revenues it would realize from the project. On April 25, 1979, the city commission, after hearings, adopted resolution 79-15887, which reaffirmed the finding of blight in the area, the finding of necessity for redevelopment, and the creation of the redevelopment agency.
In the validation decree, the trial court recited at length the evidence which it found supported resolution 79-15887. The project area consists of some 235 acres. Of 420 structures in the area, 205 are "defective, substandard or obsolete requiring clearance to achieve sound planning objectives." Most of the buildings are over forty years old. A substantial number of them do not conform to the municipal building code. Most of the project area does not conform to "current flood control criteria." The streets suffer from deterioration and subsidence. The storm and sanitary sewers are antiquated and unhealthy. Street lights are in a deteriorated condition. The water system fails to meet flow requirements for fire protection.
The court found further that there is "substantial" nonconformity of land uses to city building and zoning codes, including lot size, density, parking, and setback requirements. The 1323 separate parcels of land have 1200 separate owners, resulting in a 90 per cent rate of diversity of ownership.
The fire and rescue service requirements per capita in the area are approximately twice those of the remainder of the city. With 4.3 per cent of the land area and 6.2 per cent of the population, the area *883 accounts for 12 per cent of the felonies committed in the city. Forty-seven per cent of the people in the area have incomes below "the poverty level." In 1978, the area accounted for $880,000 in municipal ad valorem, resort, franchise, and utility taxes (total city revenue) but accounted for $3,950,000 in city expenditures for public services.
The court concluded that the area is a place of "sub-human living conditions" with nearly half the people "in abject poverty" surviving on a diet of cat food. These people are a drain on the city's capacity to provide social services. They pay exorbitant rents for the "hovels" in which they live. They are plagued by violent crime and fear to walk the streets at night.
In 1971, the court found, the city adopted new zoning and housing codes. Enforcement of the new regulations failed to stem the tide of blight. A moratorium on construction, promulgated in 1973, has not been challenged. From this the court concluded that private investors are not interested in the area because of current conditions.
The redevelopment plan includes provision for relocation of some of the people who will be turned out because of demolition proposals. The court found:
The plan, by phased relocation and construction of new housing, makes adequate provision for the relocation of those who are displaced from their present places of residence in the South Shore area. The Agency, joined by the City of Miami Beach and Dade County, have made an irrevocable commitment to the residents of South Shore who will be relocated in the redevelopment of the area, that every humanitarian effort which is necessary will be made to assure minimal emotional trauma to those who are to be relocated. Additionally, the Agency and the two levels of government involved have guaranteed the availability of subsidized housing for all eligible displacees, and permanent subsidies for those who are over 65 years of age at the time of relocation.
The Court further finds that the relocation of older residents in the area who subsist on fixed incomes which are at or below poverty level into decent, affordable, subsidized accommodations, together with the proper handling of these fragile people during the transition period will inure to their benefit and allow them the opportunity to achieve a quality of life and dignity which they could not hope to achieve in their present accelerating demoralizing conditions.
The court found that the proposed bonds were to be issued to finance projects in furtherance of a public purpose. The court found further that the bonds to be issued were not in violation of article VII, section 10, Florida Constitution.
Nowhere in the final judgment, or anywhere in the record before us, is it indicated that the proposed bond issues have been approved by referendum. The trial court found that the proposed bonds are not payable from ad valorem taxation and therefore are not subject to the referendum requirement of article VII, section 12, Florida Constitution.
The State Attorney of the Eleventh Judicial Circuit, on behalf of the appellant the State of Florida, argues five issues in her brief. She contends that the Miami Beach Redevelopment Agency has no authority to bring an action for validation of bonds; that the agency is not a legally constituted entity; that the city commission was without authority to exercise the redevelopment powers provided for by the act; that the redevelopment project involves the use of eminent domain for purposes not public, in violation of article X, section 6, Florida Constitution; and that the bonds to be issued will be payable from ad valorem tax revenues but have not been approved by referendum as required by article VII, section 12, Florida Constitution.

I.
The state attorney argues that the Miami Beach Redevelopment Agency is not one of the kinds of entities authorized under chapter 75, Florida Statutes (1979) to institute an action for the validation of *884 bonds. Section 75.02 provides for the filing of a complaint to determine authority to incur bonded debt by "any county, municipality, taxing district or other political district or subdivision of this state... ." We have held that this language encompasses all entities with authority to issue bonds and that all such entities are therefore intended to be authorized to bring a complaint for validation. Nohrr v. Brevard County Educational Facilities District, 247 So.2d 304 (Fla. 1971); State v. Inter-American Center Authority, 84 So.2d 9 (Fla. 1955). Chapter 163 clearly authorizes the establishment of redevelopment agencies as political bodies authorized to issue bonds. Therefore, this contention is without merit.

II.
The state attorney contends that the Miami Beach Redevelopment Agency is not a legally constituted entity. She points out that in the case of a chartered county, under section 163.410, the redevelopment powers provided for by the act are vested in the county. The county may delegate the authority to a municipality with respect to redevelopment projects undertaken within the municipality's boundaries. The city created the agency on February 17, 1976 after finding the existence of blight on February 19, 1975. The county did not delegate redevelopment powers to the city until February 1, 1977. The state attorney asserts that under section 163.360, a local government cannot take any action in the redevelopment field until it has found and declared the existence of blight. Therefore, she argues, the city had no authority to create a redevelopment agency until April 25, 1979, when, after having had redevelopment authority delegated to it by the county, it adopted a resolution finding the existence of blight.
The agency responds that when the county delegated redevelopment powers to the city in February, 1977, it expressly referred to and recognized the city's creation of the agency in February, 1976. Anything the city did without authority was thus ratified by the county. On April 25, 1979, the city reaffirmed its earlier finding of blight and its creation of the redevelopment agency. When the county subsequently approved the bond resolutions adopted by the agency in connection with the project, it made clear its ratification of the actions taken by the city. We agree with the agency on this point. Clearly the local officials allowed the steps in the process to get somewhat out of order. Nonetheless, this fact alone does not present an impediment to our approval of the validation decree in this case.

III.
The state attorney posits another failure to follow the process provided for by the statute. She points out that the city commission never passed an ordinance or resolution approving the issuance of bonds by the agency. Section 163.385(3) provides that the "governing body"  meaning in this instance the city commission  must authorize the issuance of redevelopment bonds. The agency responds that when the county delegated redevelopment powers to the city pursuant to section 163.410, it reserved, as it may, the authority to give final approval to any bond issue. The county commission did approve the instant bond issues by resolution. For purposes of the section 163.385(3) requirement of approval of bonds by the "governing body," the agency argues, the county was that body. Furthermore, when the city adopted and approved the final redevelopment plan, its action constituted an approval of the bonds, if one was necessary, sufficient to satisfy the requirement of section 163.385(3). We agree with the agency and hold that the bond issues have received the approval of the "governing body."

IV.
The fourth issue in this case actually has two components, and we will treat them separately. The first is whether chapter 163, Florida Statutes (1977), violates the requirements of article VII, section 10 and article X, section 6, Florida Constitution, that public bonded financing and the power of eminent domain must serve a public purpose. *885 The second is whether the determination of public purpose in this case is supported by competent, substantial evidence.

A.
The state attorney argues that the use of bond proceeds to acquire the land for the project by eminent domain is prohibited by article X, section 6, Florida Constitution, because the project does not serve a public purpose. This contention necessarily calls into question the constitutionality of chapter 163, which authorizes projects such as this one and declares that they serve such a public purpose. The state attorney might well have expanded her argument, because if the statute violates article X, section 6 by authorizing eminent domain without the justification of a public purpose, such lack of public purpose also renders the sale of any bonds and the expenditure of any public funds on the project a violation of article VII, section 10, Florida Constitution, provided the project is not among those excepted from that section.[2]See State v. Town of North Miami, 59 So.2d 779 (Fla. 1952).
Article X, section 6 provides in part:
(a) No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.
Article VII, section 10 provides in part:
Neither the state nor any county, school district, municipality, special district, or agency of any of them, shall become a joint owner with, or stockholder of, or give, lend or use its taxing power or credit to aid any corporation, association, partnership or person; but this shall not prohibit laws authorizing:
(a) the investment of public trust funds;
(b) the investment of other public funds in obligations of, or insured by, the United States or any of its instrumentalities;
.....
The remaining exceptions pertain to public capital projects, industrial development projects, and electrical utilities projects. Art. VII, § 10(c), (d), Fla. Const. The purpose of article VII, section 10 is to "protect public funds and resources from being exploited in assisting or promoting private ventures when the public would be at most only incidentally benefited." Bannon v. Port of Palm Beach District, 246 So.2d 737, 741 (Fla. 1971).
The standard for determining the question of "public purpose" is the same under article VII, section 10 and article X, section 6. If a project serves a public purpose sufficient to allow the expenditure of public funds and the sale of bonds under article VII, section 10, then the use of eminent domain in furtherance of the project is also proper. See State v. Town of North Miami, 59 So.2d 779, 785 (Fla. 1952).
State v. Town of North Miami was decided under article IX, section 10 of the Constitution of 1885, one of the predecessor provisions of article VII, section 10. Decisions construing predecessor provisions of the constitution having the same import as current provisions are sources of authority for the construction of the successor provisions. Weber v. Smathers, 338 So.2d 819 (Fla. 1976); In re Advisory Opinion to the Governor, 112 So.2d 843 (Fla. 1959).
We note that this challenge to the legality of the project to be financed by the proposed bonds is proper in these proceedings because "validation proceedings involve a determination not only of the authority *886 of an agency to issue bonds or revenue certificates, but also whether the agency may lawfully expend the proceeds for the contemplated purpose." State v. Suwannee County Development Authority, 122 So.2d 190, 193 (Fla. 1960).
Under article VII, section 10, neither the state nor any of its subdivisions may expend public funds for or participate at all in a project that is not of some substantial benefit to the public, even where there is no proposed exercise of the eminent domain power and no public indebtedness, subject to the exceptions set out therein. See, e.g., State v. Housing Finance Authority, 376 So.2d 1158 (Fla. 1979); State v. Putnam County Development Authority, 249 So.2d 6 (Fla. 1971).
The legislature has determined that projects using eminent domain to clear blighted areas and providing for the ultimate disposition of substantial portions of the acquired properties for use by private concerns in profit-making activities serve a public purpose. This determination, while not conclusive, is presumed valid and should be upheld unless it is arbitrary or unfounded  unless it is so clearly erroneous as to be beyond the power of the legislature. E.g., State v. Housing Finance Authority, 376 So.2d 1158 (Fla. 1979); Nohrr v. Brevard County Educational Facilities Authority, 247 So.2d 304 (Fla. 1971); State v. Reedy Creek Improvement District, 216 So.2d 202 (Fla. 1968); State v. Daytona Beach Racing and Recreational Facilities District, 89 So.2d 34 (Fla. 1956).
This Court has declared many times that a public body may not use its governmental authority and its public funds to acquire lands  whether by purchase or eminent domain  where the only purpose of the acquisition is to make the properties available for private uses. E.g., Baycol, Inc. v. Downtown Development Authority, 315 So.2d 451 (Fla. 1975); City of West Palm Beach v. Williams, 291 So.2d 572 (Fla. 1974); Grubstein v. Urban Renewal Agency, 115 So.2d 745 (Fla. 1959); City of West Palm Beach v. State, 113 So.2d 374 (Fla. 1959); State ex rel. Ervin v. Cotney, 104 So.2d 346 (Fla. 1958); Panama City v. State, 93 So.2d 608 (Fla. 1957); Adams v. Housing Authority, 60 So.2d 663 (Fla. 1952); State v. Town of North Miami, 59 So.2d 779 (Fla. 1952). In applying this rule, a long-standing corollary must be kept in mind:
The mere fact that some one engaged in private business for private gain will be benefited by every public improvement undertaken by the government or a governmental agency, should not and does not deprive such improvement of its public character or detract from the fact that it primarily serves a public purpose. An incidental use or benefit which may be of some private benefit is not the proper test in determining whether or not the project is for a public purpose.
State v. Board of Control, 66 So.2d 209, 210-11 (Fla. 1953).
In State v. Town of North Miami, 59 So.2d 779 (Fla. 1952), a local government sought to issue bonds to finance an industrial plant. The Court held the proposed bonds invalid under article IX, section 10 of the 1885 Constitution, which prohibited local government aid or lending of credit to any private concern and which unlike our present article VII, section 10, provided no exception for industrial plants. Conceding the benefit of any new business to a community, the Court found that the private use and benefit were paramount and the public benefit only incidental. After distinguishing cases dealing with government office buildings, airports, and recreation projects, the Court said:
In none of the cases decided by this Court since the adoption of our present Constitution have we approved any special legislative acts which authorized any of the political subdivisions or governmental units of the State to acquire property and erect buildings thereon for the exclusive use of a private corporation for private gain and profit.
.....
Our organic law prohibits the expenditure of public money for a private purpose. It does not matter whether the *887 money is derived by ad valorem taxes, by gift, or otherwise. It is public money and under our organic law public money cannot be appropriated for a private purpose or used for the purpose of acquiring property for the benefit of a private concern. It does not matter that [sic] such undertakings may be called or how worthwhile they may appear to be at the passing moment. The financing of private enterprises by means of public funds is entirely foreign to a proper concept of our constitutional system. Experience has shown that such encroachments will lead inevitably to the ultimate destruction of the private enterprise system.
Id. at 784-85.
In the later case of Panama City v. State, 93 So.2d 608, 610 (Fla. 1957), the city, pursuant to authority in its charter, proposed to issue bonds and use eminent domain for a waterfront development project. The project was on two sites and consisted of a city hall, civic auditorium, other public buildings, two large marinas, and some "concession" buildings. The plan was to allow a number of private shops to operate in the concession buildings. The record showed that rentals from private uses would account for 20 per cent of the yearly project revenue, but that the shops would occupy only 1.22 per cent of the total area of the project.
There was no question, the Court said, as to the public purpose of the city buildings, and marinas. The Court then approved the project because the evidence showed the remaining facilities to be "a necessary adjunct to the successful operation of the main enterprise, namely the marina." Id. at 614. The private uses were not so substantial as to destroy the public nature of the project. So, article IX, section 10, Constitution of 1885, was not violated. See also Gate City Garage, Inc. v. City of Jacksonville, 66 So.2d 653 (Fla. 1953).
In City of West Palm Beach v. State, 113 So.2d 374 (Fla. 1959), on the other hand, the Court examined a civic center and marina to be financed through the sale of bonds and found that the private use and benefit dominated the project. The project contemplated not only private servicing shops for the facility, but also lease of the civic center itself for operation by a private concern. In State v. Daytona Beach Racing & Recreational Facilities District, 89 So.2d 34 (Fla. 1956), however, the Court upheld a finding of public purpose in the construction of a racetrack and stadium that were to be placed in private hands a substantial part of each year. Because of the entertainment value and the promotion of tourism, and because of provision for substantial public recreational use, the Court concluded, "[t]he public purpose here seems to be predominant and the private benefit and gain to be incidental." Id. at 37.
In City of West Palm Beach v. Williams, 291 So.2d 572 (Fla. 1974), there was a challenge to the validity of leases of city-owned property to private persons to operate for profit. The city owned a facility consisting of a marina, gasoline station, restaurant, and parking lot. The city was operating the marina and the metered parking lot. The restaurant and service station were being leased to private persons and operated for profit. The challengers contended that these leases of public property for private gainful operation were unlawful. The Court noted that there was no proposal to spend public funds, sell bonds, or use eminent domain. Legislation had authorized municipalities to lease out properties determined not to be currently needed for public use. The Court upheld the validity of this authority. The question of how the city came to acquire such properties as a restaurant and a gas station was not raised.
In Baycol, Inc. v. Downtown Development Authority, 315 So.2d 451 (Fla. 1975), the local downtown development authority planned to issue bonds to finance construction of a parking garage and shopping mall as one project. The bond resolution stated the purpose as improvement of traffic and parking facilities. After the validation of the bonds, the authority brought eminent domain proceedings. The landowners challenged the taking on the ground that there was no public purpose. After deciding that, *888 because of inadequacy of the notice of the details of the plan at the time of validation, the landowners could raise this challenge in eminent domain proceedings, the Court held that the private uses were more than incidental and deprived the project of a public purpose. The Court concluded from the record that without the private commercial activities, there was no demonstrated need for the parking garage. Parking was the purported public use underlying the project. But parking was incidental to the predominant private use of the retail shops. The tail was wagging the dog.
In the above-discussed case of State v. Town of North Miami, 59 So.2d 779 (Fla. 1952), the Court delivered a strict statement on the relation between private use and public purpose. That statement contrasts with Panama City v. State, 93 So.2d 608 (Fla. 1957), where the Court said, "[t]he development of the law in this State on this question and particularly a study of the legislative history with relation to public projects of a recreational and entertainment nature reveals the allowance to the public bodies of an extremely wide latitude in this field." Id. at 613. State v. Town of North Miami dealt with public construction of a manufacturing plant which at that time was clearly impermissible. The Court there said:
There is no similarity between this case and those where the Legislature authorizes a municipality to establish a sewage system, a water system, an electric light plant, or to furnish some other public utility or service essential to the welfare of all the people of a municipality; or for the exercise of the police power for slum clearance, or for the removal of blighted areas, or some such other undertaking for the protection and conservation of the public health, or to eliminate crime-breeding places or to conserve the morals, or protect the lives and limbs of the people.
This is simply a case where the municipality is attempting to use the power of the municipality to purchase land and erect industrial or manufacturing plants thereon for the use of a private corporation for private profit and private gain.
59 So.2d at 787.
It was recognized very early then that slum clearance and public housing, when declared to be so by the legislature, were public purposes. Since the public purpose put forth in the instant case is the redevelopment of a blighted area, we should give consideration to cases where the purposes of slum clearance and housing were in issue.
In Marvin v. Housing Authority, 133 Fla. 590, 599, 183 So. 145, 149 (1938), the Court had before it the "entirely new question" whether slum clearance and public construction of housing for persons of low income were projects with a public purpose. The legislature had authorized both the sale of bonds and the use of eminent domain in connection with such projects. The Court held that there was no basis for rejecting the nearly conclusive legislative determination that a public purpose would be served.
In the subsequent case of Adams v. Housing Authority, 60 So.2d 663 (Fla. 1952), the project involved "clearing a blighted area by acquiring by purchase or eminent domain real estate in the blighted residential area and [making] it available for sale or lease to private enterprises." Id. at 664 (emphasis in original). The plan did not provide for the return of the acquired area to use for residential housing. The opinion discussed earlier cases, such as Marvin, where the Court had upheld projects under statutes providing for slum clearance and the construction of low-income housing on the cleared sites. Here, in contrast, the local authority planned to convey the sites for development and operation by private concerns. The Court found this deviation from precedent fatal:
The question in this case is not simply the abatement or discontinuance of a nuisance or a blighted area. This is not simply a case of slum clearance in order to promote the public health, safety, morals and general welfare of the inhabitants and citizens of Daytona Beach. On its face it is a "redevelopment" plan and a mere inspection of the plan shows it to be *889 a real estate promotion. The very words of the plan declare it to be for the purpose of acquiring title to and ownership of several blocks of property constituting six and one-half acres now used for residences to be redeveloped and sold or leased to private individuals, associations or corporations for private commercial and industrial purposes. As will be shown hereafter, it is not the purpose of the plan to acquire this land to erect new residences to be rented to persons in the low income brackets.
Id. at 666-67 (emphasis in original). The Court held the plan violated article IX, section 10 and the restrictions on eminent domain, Constitution of 1885.
In Grubstein v. Urban Renewal Agency, 115 So.2d 745 (Fla. 1959), on the other hand, the project provided for by special law there involved clearance and redevelopment, with the ultimate return of most of the land to residential use. While some private commercial uses were to be permitted in the acquired area after redevelopment, these were found to be merely incidental  they were necessary amenities. The public purpose underlying slum clearance and public housing, the Court said, had long been established. The attack here being on the degree of private involvement  which had been overwhelming in Adams  the Court upheld the plan.
The state attorney argues that Adams v. Housing Authority, stands for the proposition that, while "slum clearance" has a public purpose, to establish the necessity for it there must be shown that conditions have deteriorated to the point where they constitute a direct danger to the public health, morals and welfare. A general purpose to make a "blighted area" more modern, more efficient, or more aesthetically pleasing is not enough. Therefore, she argues, to the extent that chapter 163 provides for clearance and redevelopment for the latter purposes, it is unconstitutional. It follows from her argument that in order to uphold chapter 163, we would have to hold that it may only be applied to areas where conditions are so unwholesome as to be a direct threat to public order. The act as so restrictively construed, she argues, cannot be applied to the proposed project on the record we have here.
The Adams case held that a public purpose there was lacking because of the private development that was to take place on land taken by eminent domain, not because there was no "slum" to be cleared. We do not believe there is a constitutional rule, based on the degree of deterioration or dilapidation of an area, that separates those situations where public intervention is permissible from those where it is not.
In Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954), the United States Supreme Court had for consideration an Act of Congress providing for the use of the eminent domain power in the redevelopment of blighted areas of the District of Columbia that were injurious to the public interest. The statute and the plan contemplated a comprehensive redevelopment with ultimate disposition to uses both public and private. The appellants were owners of a parcel on which was situated a department store. They argued that since their property was in commercial use and was not "slum" housing, and since the plan proposed ultimate disposition of the parcel to private use, the condemnation would violate the Fifth Amendment prohibitions against the deprivation of property without due process and the taking of property for a nonpublic purpose. The Court characterized one focal point of the argument: "To take for the purpose of ridding the area of slums is one thing; it is quite another, the argument goes, to take a man's property merely to develop a better balanced, more attractive community." Id. at 31, 75 S.Ct. at 101. The Court's response to the argument included the following comments:
Public safety, public health, morality, peace and quiet, law and order  these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. See Noble State Bank v. Haskell, 219 U.S. 104, 111, 31 *890 S.Ct. 186, 188, 55 L.Ed. 112. Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river.
We do not sit to determine whether a particular housing project is or is not desirable. The concept of the public welfare is broad and inclusive. See Day-Brite Lighting, Inc. v. State of Missouri, 342 U.S. 421, 424, 72 S.Ct. 405, 407, 96 L.Ed. 469. The values it represents are spiritual as well as physical, aesthetic as well as monetary. It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled. In the present case, the Congress and its authorized agencies have made determinations that take into account a wide variety of values. It is not for us to reappraise them. If those who govern the District of Columbia decide that the Nation's Capital should be beautiful as well as sanitary, there is nothing in the Fifth Amendment that stands in the way.
Once the object is within the authority of Congress, the right to realize it through the exercise of eminent domain is clear. For the power of eminent domain is merely the means to the end. See Luxton v. North River Bridge Co., 153 U.S. 525, 529-530, 14 S.Ct. 891, 892, 38 L.Ed. 808; United States v. Gettysburg Electric R. Co., 160 U.S. 668, 679, 16 S.Ct. 427, 429, 40 L.Ed. 576. Once the object is within the authority of Congress, the means by which it will be attained is also for Congress to determine. Here one of the means chosen is the use of private enterprise for redevelopment of the area. Appellants argue that this makes the project a taking from one businessman for the benefit of another businessman. But the means of executing the project are for Congress and Congress alone to determine, once the public purpose has been established. See Luxton v. North River Bridge Co., supra; cf. Highland v. Russell Car Co., 279 U.S. 253, 49 S.Ct. 314, 73 L.Ed. 688. The public end may be as well or better served through an agency of private enterprise than through a department of government  or so the Congress might conclude. We cannot say that public ownership is the sole method of promoting the public purposes of community redevelopment projects. What we have said also disposes of any contention concerning the fact that certain property owners in the area may be permitted to repurchase their properties for redevelopment in harmony with the overall plan. That, too, is a legitimate means which Congress and its agencies may adopt, if they choose.
In the present case, Congress and its authorized agencies attack the problem of the blighted parts of the community on an area rather than on a structure-by-structure basis. That, too, is opposed by appellants. They maintain that since their building does not imperil health or safety nor contribute to the making of a slum or a blighted area, it cannot be swept into a redevelopment plan by the mere dictum of the Planning Commission or the Commissioners. The particular uses to be made of the land in the project were determined with regard to the needs of the particular community. The experts concluded that if the community were to be healthy, if it were not to revert again to a blighted or slum area, as though possessed of a congenital disease, the area must be planned as a whole. It was not enough, they believed, to remove existing buildings that were insanitary or unsightly. It was important to redesign the whole area so as to eliminate the conditions that cause slums  the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational *891 areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative. The entire area needed redesigning so that a balanced, integrated plan could be developed for the region, including not only new homes but also schools, churches, parks, streets, and shopping centers. In this way it was hoped that the cycle of decay of the area could be controlled and the birth of future slums prevented. Cf. Gohld Realty Co. v. City of Hartford, 141 Conn. 135, 141-144, 104 A.2d 365, 368-370; Hunter v. Norfolk Redevelopment Authority, 195 Va. 326, 338-339, 78 S.E.2d 893, 900-901.
Id. 348 U.S. at 32-36, 75 S.Ct. at 102-104. We find this reasoning to be persuasive both on the question of whether redevelopment of merely "blighted" areas serves a public purpose and the question of whether the public purpose is destroyed merely because there will be private commercial uses in the redeveloped area.
The application of chapter 163 to slum clearance and redevelopment was at issue in City of Jacksonville v. Griffin, 346 So.2d 988 (Fla. 1977). Landowners questioned the necessity for the taking of their property. The Court disapproved the district court of appeal decision, which had erroneously discarded the trial court's findings in reference to the questions of public purpose and necessity. In the course of doing so the Court implicitly held that the use of eminent domain for slum clearance is constitutional even where the predominant land use of the area will ultimately be private.
We hold that chapter 163, Florida Statutes (1977), authorizing redevelopment projects involving expenditure of public funds, sale of public bonds, the use of eminent domain for acquisition and clearance, and substantial private and commercial uses after redevelopment, is in furtherance of a public purpose and is constitutional. The wisdom of authorizing the cataclysmic demolition and redesign of neighborhoods or even whole districts is not for the Court to determine.

B.
The second component of the state attorney's argument, in which she is vehemently joined by the intervening appellant, is that the evidence in the court below was insufficient to establish the existence of conditions justifying the exercise of redevelopment powers under chapter 163. As has already been pointed out, chapter 163 prescribes a range of policy responses to the problems of slums and blight. These range from conservation and rehabilitation programs to area-wide acquisition and clearance. Between these two points lie the intermediate policies, which may involve any of a multitude of mixed programs. The use of eminent domain for acquisition and demolition of specific structures, along with other kinds of land use controls, involves a lower degree of government intrusion into the private real property market than does acquisition and clearance of a large area. The appellants argue that in order for the redevelopment plan to serve a public purpose, it must be shown that conditions are such that the particular degree of acquisition and clearance is necessary to accomplish the purposes of the act.
Quoting from the redevelopment plan, the state attorney asserts that the statement of its "objective" reveals its purpose:

*892 The central objective of this Plan is to renew and create economic stimulation within this area to create an environment which will establish this area as the focal point of the community, to create a functioning balance of commercial (retail and office) and public space as well as to provide limited residential uses which will re-establish the aesthetic, economic and social viability of the project area.
The purposes of the act, she argues, are the elimination of slums and blight and such redesign and redevelopment of the area as are necessary to prevent their return, and not redesign of an area in order to promote new, different land uses that are perceived by officials as desirable.
The statute defines "blighted area" as: an area in which there are a substantial number of slum, deteriorated, or deteriorating structures and conditions which endanger life or property by fire or other causes or one or more of the following factors which substantially impairs or arrests the sound growth of a county or municipality and is a menace to the public health, safety, morals, or welfare in its present condition and use:
(a) Predominance of defective or inadequate street layout;
(b) Faulty lot layout in relation to size, adequacy, accessibility or usefulness;
(c) Unsanitary or unsafe conditions;
(d) Deterioration of site or other improvements;
(e) Tax or special assessment delinquency exceeding the fair value of the land; and
(f) Diversity of ownership or defective or unusual conditions of title which prevents the free alienability of land within the deteriorated or hazardous area.
§ 163.340(8), Fla. Stat. (1977).
The state attorney declares that the record shows that the redevelopment plan proposes the demolition of all of the 420 buildings in the area except for eight to twelve existing buildings deemed to be compatible with the project. The improvements to be made include new streets and utilities, a system of canals, and the construction of luxury apartment buildings, hotels, stores, and parks. The state attorney makes reference to a survey, which the Agency concedes "forms the basis upon which the final plans for redevelopment have evolved," that concluded that much of the area could be conserved. The survey report called for much less acquisition and demolition than the plan proposes. Another study, part of the record below, concluded that the vast majority of the structures in the area are sound.
The City of Miami Beach, appellant states, adopted its first zoning ordinance in 1930. In 1971, it adopted a new zoning ordinance. Under the new ordinance, all the existing buildings in the area were rendered nonconforming. The final judgment's reliance on the nonconformity in upholding the finding of blight, it might be suggested, recognizes the retroactive creation of blight by local ordinance.
The state attorney argues that evidence that private investment in the area is not feasible without the redevelopment plan has also been created by local government. In September, 1973, the City imposed a moratorium against the issuance of building permits for the area. This ban on construction and improvements was to last six months. Appellants state that it has been in effect continuously since its initial adoption. Appellee disputes this, but neither party's appendix shows clearly what the facts are with regard to this moratorium. The trial court found that the moratorium in no wise prevented rehabilitative steps by landowners, and that the evidence was all to the effect that property owners simply had no interest in expending their funds in this area.
The state attorney asserts that over half the real property in the area is publicly owned, much of it being the property of the city and composed of streets and parks. She argues that the deteriorated condition of these facilities can be remedied without the large-scale use of eminent domain, and therefore the drastic actions proposed by the plan are unnecessary.
The area has about 7000 residents, most of them elderly and of low income. Some of them own houses or condominiums. Most, however, rent apartments or rooms. The Agency estimates that the plan will uproot 4200 households and 450 businesses. The redevelopment plan provides for the construction of one low income housing project with 450 units. Most displaced families and individuals, therefore, will have to be relocated out of the area.
Appellants assert that there was no showing whatsoever of a relationship between conditions in the area and disease. They also declare that there was no evidence that the buildings in the area constitute fire hazards. The Agency refers us in the record to the minutes of a city commission *893 meeting where it was reported that the area, with 6.2 per cent of the city's area and 4.6 per cent of its population, had 11.7 per cent of the fire calls and 12.98 per cent of all "rescue incidents." The appendices before us do not show the source of this information, nor whether the incidence of fire and accidents were at all related to the conditions of the buildings (as opposed to the characteristics of the inhabitants).
The appellants argue that the trial court's finding of a relationship between conditions in the area and the crime rate is erroneous. Appellants attribute some of the area's higher incidence of crime to the presence of a public pier and beach recreation area, which draws all kinds of elements from outside the area. The fact that most of the area's residents are elderly, and thus vulnerable to street crime, appellants assert, does not establish any relationship between conditions in the area and crime.
The appellants also question the court's conclusion that the area has a faulty lot and street layout, as determined by the redevelopment plan. Appellants contend there is no evidence to support this finding.
The court found that the redevelopment plan, providing as it does for the assisted relocation of the residents, will contribute to the welfare of those people and better their lot in life. The appellants point out, however, that the betterment of the conditions under which the residents live does not appear to be the main thrust of the redevelopment plan. Many of the factors cited that pertain to the residents  their poverty, their relatively high need for social services, etc.  are attributable to age and disability and not to the physical conditions of the area. The problems of age and disability will follow the residents wherever they are relocated. For most of them, that will be outside the area.
When poor people are in the market for housing, they tend, because of their relative lack of economic power, to choose the relatively less desirable places to live. Dwellings that are available at a low rental, unless subsidized, tend to be in the less desirable neighborhoods, that is, the blighted areas. In a society committed to equitable distribution of social services based on need, such areas will always consume more in public services than they produce in ad valorem taxes. Therefore, reliance on a deficit of services consumed vis-a-vis taxes collected is not alone a justification for condemnation of an area and dispersal of its residents. Incidentally, whatever benefit may accrue to the community at large from the redevelopment of the south end of the city, and to the new residents who will live there after redevelopment, the project guarantees no direct relief to the displaced poor. The trial court found, however, a benefit to the displaced poor in the agency's relocation plan, which promises decent housing for all and permanent subsidies for some.
Plainly, the trial court resolved conflicts in the evidence in favor of the redevelopment plan. The court's findings are adequately supported by competent, substantial evidence, and must be affirmed.

V.
The final contention urged on the Court is that the proposed bonds are payable from ad valorem taxation within the meaning of article VII, section 12, and therefore may not be issued without vote of the electorates of Dade County and the City of Miami Beach.
As previously explained above in the factual statement of this opinion, section 163.387(2), Florida Statutes (1977), provides that each local government entity with taxing authority in the redevelopment area, except school districts, "shall annually appropriate" to the redevelopment trust fund an amount not less than the amount of tax increment revenue that accrues to the local government. Section 163.387(1) defines ad valorem tax increment. It is the difference between the amount of ad valorem taxes levied by those local governments each year and the amount that would have been produced by the same levy on the assessed value of taxable property in the redevelopment area before the implementation of the plan. Thus the tax increment revenues are *894 measured by the increase in proceeds brought about by the increased value of the property, to be achieved by the improvements made under the redevelopment plan.
Under article VII, section 12 of the Florida Constitution, the power of "[c]ounties, school districts, municipalities, special districts and local governmental bodies with taxing powers" to borrow for capital projects, for terms in excess of twelve months, is conditioned, where the obligations are to be "payable from ad valorem taxation," upon approval of the eligible voters by referendum. Appellants argue that the proposed bonds are "payable from ad valorem taxation" because the required contributions of the county and the city to the repayment fund will be derived from their tax levies on the real property in the area.
The Agency argues, on the other hand, that proposed financing plan does not come within the referendum requirement because: the statute and the bond resolutions declare that there is no pledge of the county and city ad valorem taxing power; the statute provides that the bondholders' lien attaches only after the revenues are deposited in the trust fund; and the ad valorem tax is not necessarily deposited directly into the fund but is merely the measure of the contributions the county and city will make annually from its general operating revenues until the bonds have been paid. They are not required to be made from ad valorem tax revenues at all, the appellee argues, but may be derived from any available funds. The Agency contends in effect that where there is no direct pledge of ad valorem tax revenues, but merely a requirement of an annual appropriation from any available funds, the referendum provision of article VII, section 12 is not involved. We agree with this view, in explanation of which we turn to the precedents interpreting the constitutional provision and its predecessor.
Much of the judicial treatment of the referendum requirement is found in cases decided by this Court under article IX, section 6 of the Constitution of 1885, the predecessor provision. That section provided in part that:
Countries, Districts, or Municipalities of the State of Florida shall have power to issue bonds only after the same shall have been approved by a majority of the votes cast in an election in which a majority of the freeholders who are qualified electors residing in such Counties, Districts, or Municipalities shall participate, to be held in the manner to be prescribed by law... .
This provision was adopted by the people in 1930. See S.J.Res. 26, Laws of Fla. (1929). "Its outstanding purpose," the Court said of the amendment early in its history,
was to lay a restraint only on the spendthrift tendencies of political subdivisions to load the future with obligations to pay for things the present desires, but cannot justly pay for as they go, thereby necessitating the involvement of the public credit in some form of funding or borrowing operation by which money can be realized on credit beyond the present means of payment so as to become available for disbursement in paying for considerations received in the present to be discharged out of public revenues anticipated to be realized or raised in the future.
Leon County v. State, 122 Fla. 505, 514, 165 So. 666, 669 (1936).
Two preliminary observations are in order. First, we observe that the recitals in the statute and in the bond resolutions, to the effect that the bonds shall not be deemed a pledge of the ad valorem taxing power and therefore do not require a referendum, are not conclusive of the issue in this proceeding. The legislative finding of constitutionality is presumptively correct, but this Court must disapprove it if it is clearly erroneous. The Court looks at the substance and not the form of the proposed bonds. See e.g., State v. City of Key West, 153 Fla. 226, 14 So.2d 707 (1943); Clover Leaf, Inc. v. City of Jacksonville, 145 Fla. 341, 199 So. 923 (1941).
However, once bonds are validated, and if appealed, the validation is *895 affirmed, then recitations of constitutionality and satisfaction of conditions precedent are binding on the issuing authority, which will not be heard to question such matters in actions brought for the enforcement of bondholders' rights. See Jefferson County v. Lewis, 20 Fla. 980 (1884). Where bonds are unconstitutional and void ab initio, and the purchaser takes them with knowledge of their potential invalidity, the recitals of constitutionality will not be held binding on the issuer, Nuveen v. City of Quincy, 115 Fla. 510, 156 So. 153 (1934), but after validation, the courts will protect even the purchasers of unconstitutional bonds. See Columbia County v. King, 13 Fla. 451 (1870); Patterson, Legal Aspects of Florida Municipal Bond Financing, 6 U.Fla.L.Rev. 287, 289 (1953) [hereinafter cited as Patterson].
Second, when a government agency with taxing power is authorized by statute to levy a tax and to appropriate the proceeds thereof to the repayment of bonds, the statutory authority to levy the tax "may be regarded as mandatory and not merely permissive." State ex rel. Babson v. City of Sebring, 115 Fla. 176, 181, 155 So. 669, 672 (1934). After bonds have been issued, validated, and sold, the statutory authority to devote governmental revenues to the retirement of bonds becomes a contractual duty to do so. State ex rel. Dos Amigos, Inc. v. Lehman, 100 Fla. 1313, 131 So. 533 (1930); Klemm v. Davenport, 100 Fla. 627, 129 So. 904 (1930).
The reason for the rule is patent. The state has authorized the city of Sanford to issue its bonds and exercise its power of taxation to an extent necessary to pay the principal and interest thereon when they mature. When issued and negotiated they become a contract between the city and the holder. The power to tax is the very essence of the bonds. In the absence of a legal right to enforce this power, they would be worthless. Under the law of this state the property in the municipality is not bound in like manner, as the property of an individual under a mortgage for their payment, but, when issued under such acts as those brought in question, the act itself becomes a part of the contract, protected from invasion by the federal Constitution (article 1, § 10), as much so as if it had been written at length on the face of the bond. Such statutes or the rights of bondholders acquired under them cannot be repealed or abrogated by any law of the state statutory or constitutional, until the obligations incurred under them are paid and discharged according to their terms.
State ex rel. Dos Amigos, Inc. v. Lehman, 100 Fla. at 1325, 131 So. at 538.
Very early in the history of the amendment, the Court began to make distinctions among types of local government financing, and held that various kinds of debts were not "bonds" for purposes of the referendum requirement. In State v. City of Miami, 113 Fla. 280, 152 So. 6 (1933), the city proposed to finance the reconditioning and expansion of its existing water supply system by issuing "water revenue certificates" to be repaid solely with revenue received from water users. Because there was no chance that the taxing power of the city might be called upon to pay the debt, the Court reasoned, the certificates were not municipal bonds for purposes of article IX, section 6. The amendment was adopted, the Court said, in light of the long established practice of municipalities operating utilities. The practice of borrowing on the security of future revenues of an existing utility, in order to raise capital to preserve that system upon which the inhabitants of a community have come to depend was not, the Court concluded, among the evils the amendment was designed to remedy.
At first the Court limited this holding to the improvement or expansion of an existing utility, on the theory that the public dependence and necessity were clear. E.g., Williams v. Dunnellon, 125 Fla. 114, 169 So. 631 (1936). See also State v. City of Tampa, 148 Fla. 6, 3 So.2d 484 (1941). But soon the Court began to allow bonds to be sold without referendum to finance new projects as well, when it was clear that the revenue generated from user fees would be sufficient to meet the bond obligations as they *896 came due. See, e.g., State v. City of Miami, 72 So.2d 655 (Fla. 1954); State v. City of Key West, 153 Fla. 226, 14 So.2d 707 (1943); Flint v. Duval County, 126 Fla. 18, 170 So. 587 (1936). Cf. State v. Board of Control, 65 So.2d 469 (Fla. 1953) (state obligations were not "bonds" because they were payable solely from revenue to be realized from operation of facilities to be constructed with the borrowed capital). See also Patterson, supra, at 317.
In contrast to the early State v. City of Miami, supra, was the case of Boykin v. Town of River Junction, 121 Fla. 902, 164 So. 558 (1935). There the Court disapproved the issuance of "revenue certificates" proposed for the purpose of financing the expansion of an existing public utility, where the scheme contemplated not only repayment from the revenues of the utility but also a mortgage on the physical assets themselves. The possibility of loss of the assets through foreclosure, the Court concluded, might compel the exercise of the taxing power to pay the obligations should the revenues of the system prove insufficient. Therefore the plan violated article IX, section 6. Similarly, in Broward Port Authority v. State, 129 Fla. 73, 175 So. 796 (1937), the Court approved the lower court judgment which had validated a plan to borrow for improvement of port facilities, where the port revenues were pledged to repayment, while disapproving a mortgage the issuing authority had given as further security. To approve the mortgage, the Court reasoned, would have been to approve a debt for payment of which the local authority could be coerced into levying a tax.
In another series of cases, the Court designated another category of local government borrowing as outside the meaning of the word "bonds" for purposes of the referendum requirement. It developed that counties could levy a legislatively authorized ad valorem "building tax" for essential government buildings, such as courthouses and jails, and pledge the revenues to the payment of obligations incurred to finance the construction of such projects, without referendum. This development is illustrated by the contrast between Leon County v. State, 122 Fla. 505, 165 So. 666 (1936), and subsequent cases. There the Court said:
Any contractual device for the present funding of tax revenues contemplated to be raised or made available for reimbursement in future years, contrived to be issued as an enforceable legal security to the obligee, or his assignee, by means of which such obligee or his assignee will acquire a legal or equitable right to coerce by judicial processes the repayment of a sum of money advanced on the strength thereof, together with interest for the hire of the amount advanced, however calculated or provided to be paid upon the sum so involved, is in contemplation of amended section 6 of article 9 of the Constitution of Florida a "bond" and within the purview of the specific prohibitions and limitations of that section as to the issuance of "bonds."
Id. at 507-508, 165 So. at 667. The Court observed that although the proceeds of the building tax could not be pledged without the approval of the freeholders, it would be permissible to allocate the proceeds of the tax to a building program each year as and when they were collected.
In Tapers v. Pichard, 124 Fla. 549, 169 So. 39 (1936), the Court referred to the observation in Leon County v. State that the proceeds of the legislatively authorized building tax could be paid in installments, as and when collected, for the construction of a building essential to the conduct of county business. Tapers involved the very same project  a jail for Leon County. Patterson, supra, at 307. The Court reasoned that if the proceeds of the tax could be allocated in installments as and when collected, there was nothing in the constitution to prevent a county from issuing certificates of payment to a contractor for construction of a necessary building. The Court concluded that article IX, section 6 was not intended to apply to "contracts for current governmental needs when executed in due course of authorized budgetary requirements." Tapers v. Pichard, 124 Fla. at 553, 169 So. at 40. Thus the "certificates," although they *897 were clearly issued to achieve a present funding of future anticipated ad valorem tax revenues, were held to be outside the intent of the referendum requirement. This doctrine was made clear in Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799 (1941), where the Court, citing Tapers said: "[t]he construction of a county courthouse is an essential governmental requirement of the county and certificates of indebtedness for that purpose payable from budgetary requirements in due course of law do not require an approving vote of the freeholders." Posey v. Wakulla County, 148 Fla. at 119, 3 So.2d at 801. See generally Patterson, supra, at 306-310.
This permissive view of the practice of allowing counties to realize a present funding of anticipated ad valorem tax revenues for the purpose of constructing county buildings became settled law. It was based on the proposition that the 1930 amendment was "not intended to inhibit governmental entities from entering into contracts for current governmental needs and requirements when done in due course of then authorized budgetary administration of public affairs." E.g., State v. County of Palm Beach, 89 So.2d 607, 609 (Fla. 1956).
This Court very early held that article IX, section 6 of the Constitution of 1885 did not require a referendum when bonds were proposed to be sold to finance construction of a public works project that would be self-liquidating, that is, would generate revenue sufficient to repay the bonds without any supplemental allocations of tax revenues to that purpose. The Court later expanded this rule to allow the pledging of various sources of local government revenue other than ad valorem taxes.
For example, in State v. City of Winter Park, 160 Fla. 330, 34 So.2d 740 (1948), the Court approved the issuance of bonds for sewer system improvements, payable from the sewer system revenues and from revenues of a municipal utilities service tax, without referendum. Even though municipal resources other than the revenues of the system being financed were pledged, the obligation was still a limited one, so that the Court could conclude that there was no general obligation being created. Of special significance was the fact that there was created no power in bondholders to compel exercise of the authority to levy ad valorem taxes. In Schmeller v. City of Fort Lauderdale, 38 So.2d 36 (Fla. 1948), a statute authorized the bonded financing of recreational facilities and the pledge of the revenues to be created by them supplemented by "any other available funds." The city pledged the proceeds of its utilities service tax. Because the pledge was of a limited and certain revenue source the Court held there was no involvement of the taxing power within the meaning of the constitution. The Court again approved a pledge of municipal utilities service tax revenues without referendum in State v. City of Melbourne, 93 So.2d 371 (Fla. 1957).
Other definite and limited sources of municipal revenue have been held properly pledged to the retirement of bonds without referendum, such as franchise taxes paid by privately owned utilities, Miller v. City of St. Augustine, 97 So.2d 256 (Fla. 1957); State v. City of Miami, 76 So.2d 294 (Fla. 1954), and the proceeds from state cigarette taxes collected in the municipality. Welker v. State, 93 So.2d 591 (Fla. 1957); State v. City of Coral Gables, 72 So.2d 48 (Fla. 1954). In Klein v. City of New Smyrna Beach, 152 So.2d 466 (Fla. 1963), the Court summed up the rule and rationale of these cases:
As a general rule, we have said that if proposed certificates are secured by a pledge of ad valorem taxes, they are "bonds" and must be approved by the freeholders as required by Section 6, Article IX of the Florida Constitution, F.S.A. but if they are secured by excise taxes, special assessments or charges against the facility constructed with the net proceeds thereof, they are certificates that do not have to be approved by the freeholders.
Id. at 467.
On the other hand, when a project is financed by the sale of bonds to be repaid with revenues produced by the project supplemented by governmental funds derived *898 from ad valorem taxation, an approving vote of the electorate is required.
[I]n no instance has this Court upheld the pledge of gross revenue of a facility coupled with a supporting pledge of ad valorem taxes. When gross revenues have been pledged with collateral support for operating the facility, the supporting revenues pledged have always been derived from sources other than ad valorem levies.
State v. Halifax Hospital District, 159 So.2d 231, 233 (Fla. 1963). The mere possibility, however, that the pledge of some well defined, stable local government source will have an incidental effect on the use of revenues raised by ad valorem taxes "does not subject the bonds or revenue certificates to the constitutional requirement." Rianhard v. Port of Palm Beach District, 186 So.2d 503, 506 (Fla. 1966).
Against this background, the constitution was revised in 1968 to alter the language of the referendum requirement for local bonds. That part of the revision which added the words "certificates of indebtedness" and "any form of tax anticipation certificates" was found by the Court to have expressly rejected the judicial distinction among categories of public obligations. State v. County of Dade, 234 So.2d 651 (Fla. 1970). More significantly here, there was added to the provision the qualifying words "payable from ad valorem taxation." Art. VII, § 12, Fla. Const. This limitation on the scope of the referendum requirement seems to have been a ratification of prior judicial interpretation, and the law has continued to say that local revenue sources other than ad valorem taxation may be pledged without referendum. See, e.g., State v. Orange County, 281 So.2d 310 (Fla. 1973); State v. City of Miami Beach, 234 So.2d 103 (Fla. 1970).
The bonds in the instant case are payable from a trust fund, and the fund will receive revenue from two sources. One source is the money the Agency receives from sales, leases, and charges for the use of, redeveloped property. This source is analogous to revenues generated by a utility or facility. The other source is the money to be contributed each year by the county and city, measured by the tax increment. The source of this revenue is not limited to any specific governmental revenue. That the statutory duty to make the annual contributions would become a contractual duty, part of the obligation of the bonds, does not mean, however, that these bonds are payable from ad valorem taxation, in the constitutional sense of the term.
The Agency notes that even though the money the county and city will use to make the contributions may come from ad valorem tax revenues, we have indicated this does not bring the bonds within the referendum requirement. Tucker v. Underdown, 356 So.2d 251 (Fla. 1978). In that case, county bonds previously issued without referendum to finance a solid waste disposal system had been validated as payable from user charges, giving bondholders no power to compel the levy of ad valorem taxes for operating expenses or debt service. The subsequent lawsuit concerned whether the county had violated the covenants of the earlier bond issue by levying and spending ad valorem taxes for these purposes. The Court held that it had not.
Tucker v. Underdown supports the argument that there is nothing in the constitution to prevent a county or city from using ad valorem tax revenues where they are required to compute and set aside a prescribed amount, when available, for a discreet purpose. The purpose of the constitutional limitation is unaffected by the legal commitment; the taxing power of the governmental units is unimpaired. What is critical to the constitutionality of the bonds is that, after the sale of bonds, a bondholder would have no right, if the redevelopment trust fund were insufficient to meet the bond obligations and the available resources of the county or city were insufficient to allow for the promised contributions, to compel by judicial action the levy of ad valorem taxation. Under the statute authorizing this bond financing the governing bodies are not obliged nor can they be compelled to levy any ad valorem taxes in any *899 year. The only obligation is to appropriate a sum equal to any tax increment generated in a particular year from the ordinary, general levy of ad valorem taxes otherwise made in the city and county that year. Issuance of these bonds without approval of the voters of Dade County and the City of Miami Beach, consequently, does not transgress article VII, section 12.
All of the objections raised by the state have been considered. We hold that these bonds pass legal muster on all counts, and we therefore affirm the judgment of validation.
It is so ordered.
SUNDBERG, C.J., and ADKINS, OVERTON and ENGLAND, JJ., concur.
ALDERMAN, J., concurs in result only.
BOYD, J., concurs in part and dissents in part with an opinion.
McDONALD, J., dissents.
BOYD, Justice, concurring in part and dissenting in part.
I concur in all portions of the majority opinion except the holding that the bonds, which are payable over a term of years from ad valorem taxation, may be issued without approval of the voters of Dade County and the City of Miami Beach. As a former long-time resident and commissioner of Dade County I am uniquely aware of the blighted condition of south Miami Beach and the need for renewal. The Florida Constitution, however, requires that the electorates of the local governments whose revenues are being pledged to the payment of the bonds give their approval.
Article VII, section 12, Florida Constitution, provides:
Local bonds.  Counties, school districts, municipalities, special districts and local governmental bodies with taxing powers may issue bonds, certificates of indebtedness or any form of tax anticipation certificates, payable from ad valorem taxation and maturing more than twelve months after issuance only:
(a) to finance or refinance capital projects authorized by law and only when approved by vote of the electors who are owners of freeholds therein not wholly exempt from taxation; or
(b) to refund outstanding bonds and interest and redemption premium thereon at a lower net average interest cost rate.
The 1885 Constitution contained a similar restriction on the power of local governments to issue bonds. Art. IX, § 6, Fla. Const. (1885). During the Great Depression, this Court carved out exceptions to the restriction by declaring certain kinds of county indebtedness not to be "bonds." Posey v. Wakulla County, 148 Fla. 115, 3 So.2d 799 (1941); Tapers v. Pichard, 124 Fla. 549, 169 So. 39 (1936). In doing so, the Court departed from its earlier practice of enforcing the plain language of the constitution on this issue. Leon County v. State, 122 Fla. 505, 165 So. 666 (1936).
The 1885 constitution had referred only to "bonds." When the people revised the referendum requirement for local bonds in 1968, they spoke out clearly against the Court's carved-out exceptions. They changed the language to its present form, applying the restriction to "bonds, certificates of indebtedness, or any form of tax anticipation certificates, payable from ad valorem taxation... ." In State v. County of Dade, 234 So.2d 651 (Fla. 1970), this Court concluded that the people's intent was that the restrictive language be applied without exception. The Court rejected a bond issue that was, like the present one, payable over a term of years from ad valorem taxation without referendum.
I would hold that the bonds are payable from ad valorem taxation and therefore must be approved by the electorates of the taxing authorities in question. Article VII, section 12 of the Florida Constitution requires a referendum. The Court's opinion provides no authority for or even any coherent explanation of its approval of these bond issues.
As the majority opinion correctly points out, we must look at the substance, and not the form, of what the local taxing authorities *900 are undertaking; we must carefully analyze the undertaking and not be deterred by the confusing and seemingly sophisticated language of the statute and the bond resolutions.
After this Court's approval of the validation decree, the statutory provision directing that the county and the city make annual contributions until the retirement of the bonds will become a mandatory, contractual duty to make the contributions. A purchaser of any of the bonds will be able to enforce that duty by judicial action.
The majority fails to recognize that the promised annual contributions based on the "tax increment revenue" constitute a pledge by the county and city of their general revenue. Such general obligation bonds are by definition "payable from ad valorem taxation."
If the scheme of the redevelopment project were to repay the debt from the revenue realized from sales, leases, and fees and charges imposed by the Agency, there would, by long established authority, be no problem. If the project revenue were to be supplemented with funds from a non-ad valorem revenue source, there would be no problem. But the statute authorizes the county and the city to pledge annual contributions, measured by the accrued tax increment revenue, from their general operating budgets. The general operating revenues of cities and counties in Florida are primarily drawn from ad valorem taxation.
Tucker v. Underdown, 356 So.2d 251 (Fla. 1978) does not support the approval of these bonds. In that case the issue was whether a county's action in appropriating, as a discretionary matter, revenues from its general fund to the retirement of bonds that had previously been ruled valid because ad valorem revenues were not pledged to them, violated any promises to bondholders or taxpayers. Here the city and the county will have no discretion; they will be required to annually contribute to the retirement of the bonds.
The proponents of this plan, as well as the legislators who have authorized this kind of plan, seem to think that the improvements wrought by redevelopment will produce a tremendous windfall of new revenue for Dade County and the City of Miami Beach, and that this new, unencumbered revenue can be pledged to the repayment of the bonds with little or no effect on the other taxpayers of the county and the city. The new development in the area, however, will give rise to new demands for local government services which will, I predict, far outstrip the services now provided to the area. There will be new and increased need for building inspection, police and fire protection, street and park maintenance, and other government services. The city and county will be providing new and increased services to the area, while also being obligated to contribute to the trust fund (for the benefit of bondholders) an amount equal to any increased tax revenue realized in the redevelopment area.
If, after the sales of the bonds and the accrual of the tax increment revenue, the redevelopment trust fund were to contain insufficient money to pay the bonds, and the commitments and resources of the county or city were such that they might choose not to make the required contributions, a bondholder would have the right to compel by judicial action the levy of an ad valorem tax sufficient to raise the revenue to make the promised contributions. This tax could be levied upon all taxable property in the city and the county.
I dissent from the judgment of the Court which, in my view, annihilates a constitutional restriction that was designed to keep local officials from plunging their taxpayers into debt without their approval.
NOTES
[1] As will be discussed later on in this opinion, the redevelopment agency may construct almost any kind of "improvement" deemed to be desirable. It may even construct luxurious housing units for subsequent sale or lease to private persons. Subsections 163.370(1)(a) 8 & 9 pertain to the use of "air rights sites" and contain an interesting limitation, not involved in this proceeding, on the use of such sites for housing. Section 163.370 outlines the powers of counties and municipalities to undertake projects, and such projects may include:

8. Acquisition, without regard to any requirement that the area be a slum or blighted area, of air rights in an area consisting principally of land in highways, railway or subway tracks, bridge or tunnel entrances, or other similar facilities which have a blighting influence on the surrounding area and over which air rights sites are to be developed for the elimination of such blighting influences and for the provision of housing (and related facilities and uses) designed specifically for, and limited to, families and individuals of low or moderate income.
9. Construction of foundations and platforms necessary for the provision of air rights sites of housing (and related facilities and uses) designed specifically for, and limited to, families and individuals of low or moderate income.
§ 163.370(1)(a), Fla. Stat. (1977).
[2] Certain kinds of projects are specifically allowed in article VII, section 10, which would have been held to violate that provision under case law antedating various constitutional revisions or amendments. See, e.g., State v. Putnam County Dev. Auth., 249 So.2d 6 (Fla. 1971). However, a project to be financed by bonds payable from taxation, undertaken by the state or a political subdivision, and serving a purely private purpose, would be impermissible under the due process clause of the Fourteenth Amendment to the United States Constitution, even if specifically allowed by the Florida Constitution. See, e.g., Green v. Frazier, 253 U.S. 233, 40 S.Ct. 499, 64 L.Ed. 878 (1920); City of Clearwater v. State ex rel. United Mut. Life Ins. Co., 108 Fla. 623, 147 So. 459 (1933).